IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 3:16cr342-WKW-SRW |
| | ) | |
| ROBERTO ANGUIANO, III | ) | |
| MARIO VERDUZCO | ) | |
| ANGELA QUACH | ) | |
| DEEDRE DIAZ | ) | |

**REPORT AND RECOMMENDATION**

This matter is before the court on defendants' motions to suppress (Docs. 86, 93, 96, 97) the government's collective response (Doc. 116). The motions were heard over the course of two-day evidentiary hearing on January 12-13. The court also has before it the defendants' post-hearing supplemental briefs (Docs. 152, 154, 157),[1] and the government's supplemental brief (Doc. 156).  For the reasons set out below, the court concludes that the motion is due to be denied.

**Facts**

1. <u>Stop and search by Baldwin County Deputy Jason Kolbe</u>.[2]

On the morning[3] of July 7, 2016, Jason Kolbe – a deputy in the Baldwin County Sheriff's Office special operations unit and a canine handler – was on traffic patrol on

---

[1] Defendant Quach did not elect to file a post-hearing supplemental brief.
[2] Nothing was seized during this stop and search, and defendants do not challenge it as unlawful. The facts relating to Deputy Kolbe's traffic stop are discussed here because they are relevant to the subsequent stop of the same vehicle by Deputy Rodney Arwood.
[3] Kolbe initially testified that this traffic stop took place around 9 a.m. CST, but indicated in response to cross-examination that "[i]t may have been 10 [a.m.]."

Interstate 65 in Baldwin County, Alabama. From his vantage point on the shoulder of the road near mile marker 35, Kolbe observed a northbound 2014[4] Toyota Tundra truck displaying a Texas paper tag. According to Kolbe, the paper tag was contained within a plastic cover, and condensation on the cover prevented him from seeing the expiration date below the numbers on the tag. Kolbe activated his lights to pull the truck over for a "no plainly visible tag" violation pursuant to Ala. Code §32-6-51.[5] However, the Tundra continued to travel north; after about half a mile, the vehicle finally pulled off the interstate and into the parking lot of a gas station. Kolbe has many years of training and experience in drug interdiction, and he had previously observed that drug traffickers were sometimes slow to pull over in order to let a "follow" or "trail" car behind them know that they were being stopped. The delayed stop raised Kolbe's suspicions.

Kolbe approached the parked vehicle on the passenger's side, noted that there were four occupants inside, and asked the driver – one of the two male defendants in this case[6] – for his driver's license and registration. The driver told Kolbe that he was traveling from Laredo, Texas to Montgomery, Alabama, and planned to be in Montgomery for a few days at a family reunion. Kolbe recognized the Laredo-McAllen-Edinburg area as a known

---

[4] Although Arwood initially testified that the vehicle was a 2013 Toyota Tundra, the traffic violation warning issued by Arwood indicates that the vehicle was, instead, a 2014 Toyota Tundra. Gov. Ex. 2.

[5] This section provides that, "Every motor vehicle operator who operates a motor vehicle upon any city street or other public highway of or in this state shall at all times keep attached and plainly visible on the rear end of such motor vehicle a license tag or license plate as prescribed and furnished by the Department of Revenue at the time the owner or operator purchases his license." Ala. Code §32-6-51.

[6] In court, Deputy Kolbe did not recall the driver's name, but he identified one of the male defendants as the driver by indicating his location in the courtroom.

source for narcotics trafficking. Kolbe also knew that it takes around 14 hours to travel from Laredo to Baldwin County, Alabama; thus, he believed that the driver either would have had to drive through the night or stop somewhere overnight to make the trip. When Kolbe inquired about this, the driver responded that he had driven through the night. Kolbe interpreted this response to mean that the travelers were in a hurry. The response raised his suspicions further because, in his experience, most people do not drive through the night. However, he testified that he had observed that narcotics traffickers tend to leave late and travel through the night because they believe that there is a decreased law enforcement presence on the interstates at night.

Kolbe noticed that the driver was exhibiting "some very severe signs of nervous behavior," including shaky hands and heavy breathing, which Kolbe testified was unusual for the common motorist. He invited the driver to get out and sit in his patrol car, where the two spoke further about the ownership of the vehicle and the occupants' travel itinerary while Kolbe checked the defendant's license. Kolbe had previously noticed that, although there were four people (two males and two females) in the truck, no luggage was visible in the cab and there was only one suitcase of an average size in the bed of the pickup. He believed that the amount of luggage visible in the truck did not match the story he had been told about the purpose of the trip, so he asked again about the occupants' travel plans. The driver repeated that the group was traveling to a family reunion in Montgomery.

Kolbe then returned to the truck to ask the same question concerning the group's travel plans of the other male (also a defendant in this case),[7] who was a passenger in the back seat. That passenger told Kolbe that they were traveling to Atlanta to "hang out for a few days and maybe do some shopping."

Kolbe returned to speak with the driver, and pointed out the contradiction in the two accounts he had been provided concerning the purpose of the trip. The driver responded that the group did plan to go to Atlanta, "but Montgomery is kind of close to Atlanta." Kolbe asked what the travelers would be doing in Atlanta, and the driver replied that he planned to show his new truck to friends there, and the group would stay in Atlanta for a few days. Kolbe believed that Atlanta was around four hours' drive from Montgomery, a distance which he did not consider "kind of close," and he also found this account inconsistent with the travelers' previous stories. In addition, he knew that Atlanta is a distribution hub for narcotics, and that most narcotics trafficking organizations transporting drugs from south Texas to Atlanta use either the I-65 corridor, where Kolbe had stopped defendants' truck, or the I-59 corridor through Mississippi, both of which were "significant high volume drug trafficking highways."

Kolbe also thought that the fact that the vehicle was newly registered (within three to six months of the stop, as he recalled) was significant because, in his experience, drug organizations "don't want to use the same tag over and over. So, they'll swap vehicles up. They'll give vehicles to mules and have these people register the vehicles in their names to

---

[7] Kolbe also could not recall this defendant's name, but he identified him by indicating his location in the courtroom.

avoid the usage of third party vehicles which … is what I was suspecting in this particular case … ." Kolbe noted, as well, that the interior of the truck, which was "extremely clean," nevertheless had food bags in it, indicating that the passengers had "got[ten] gas station food and things of that nature." This suggested to Kolbe that the travelers "were just constantly rolling; they had not stopped. They were just on the road going and going and going." Kolbe also noted that the male passenger seemed just as nervous as the driver, "with the heavy breathing, shaking, stuttering of words, things of that nature." For all these reasons, Kolbe suspected that the occupants of the truck were involved in drug trafficking.

Kolbe asked both the male driver and the male passenger for consent to search the vehicle. Both gave consent. Kolbe called for backup, believing that he "had a load of contraband being smuggled on the interstate." He began a consent search of the interior of the vehicle, and confirmed that there was no significant luggage visible inside and that the truck appeared to be well taken care of and extremely clean. He also got down on the ground and crawled under the truck, and he searched the suitcase that was in the bed of the pickup. During the interior search, Kolbe observed rust underneath the rear bench passenger seat frame that holds the seat down, despite the fact that the truck was relatively new and none of the other seats exhibited significant rust. Kolbe suspected that the seat "had been in and out of that truck on numerous occasions, meaning that it had been sitting outside maybe for an extended amount of time where moisture in the air had started to build up that rust on the surface of it." Kolbe believed that there was no reason other than drug trafficking for the seat to have been removed from the truck, since there was no mechanical part underneath the back seat that would have to be serviced by taking out the

seat. He suspected that there was either a hidden compartment or a natural void in that area that was being used to hide contraband. Kolbe also noted "evident tooling" on the bolts that mounted the seat to the floorboard. To Kolbe, "tooling" means scratches, abrasions, or wearing that is indicative of constant removal, and that has caused the factory paint to start to come off, exposing the bare metal.

Kolbe was unable to remove the back seat because he did not have his tool kit, which included sockets, wrenches, mirrors, a fiber-optic scope, and a density meter. These tools were in his county-issued vehicle, which was in the shop for service.[8] Kolbe did not see or feel any obviously increased depth on the back wall of the truck, or observe Bondo or weld marks or overspray, so he decided to run a "free air search pattern" around the vehicle with his canine. The dog sniffed all the way around the exterior of the truck but did not alert. Kolbe concluded that, even though he still harbored suspicions, he had to let the truck proceed. He issued a warning for the traffic violation and reluctantly sent the vehicle on its way.

Approximately two minutes later, Kolbe contacted[9] an acquaintance, Deputy Rodney Arwood, whom he had met during his work in drug interdiction and had kept in touch with over the years to talk about cases and drug enforcement. Arwood was a sheriff's deputy in Chambers County who worked I-85, the interstate route from Montgomery to Atlanta, near the Georgia state line. Kolbe got in touch with Arwood because he believed

---

[8] Because Kolbe did not have his usual vehicle, the stop was not videotaped.
[9] Kolbe initially recalled that he telephoned Arwood. However, Arwood remembered receiving a text from Kolbe saying something to the effect of, "I think I missed something – give me a call." Thereafter, Arwood called Kolbe.

that he "had just let … a significant amount of drugs go up the highway …," and he was aware of Arwood's training and experience in drug interdiction.[10] Kolbe told Arwood that he had just stopped the 2013 Toyota Tundra, that he suspected that the occupants were engaged in drug trafficking, and that they were probably going to be coming through his area in the next few hours. According to Kolbe, he told Arwood "exactly what they told me on the side of the road, from what the driver told me, the passenger, and the behaviors. And then I also told him that I had searched the vehicle and where I had searched, and Deputy Arwood asked me where do I think I missed it or where do I need to look at. And I told him that there was two areas that I did not feel confident in, that I may have missed something, and the first area was the back wall of that pickup truck and the second would be that I did not check the engine compartment very good, that he should check those two areas if he makes contact with them." Kolbe testified that he also told Arwood about the rust and the tool marks. Kolbe said, if the vehicle comes through, Arwood "might want to keep an eye out for it."

  2.  Stop and search by Chambers County Deputy Rodney Arwood

    Deputy Rodney Arwood's conversation with Kolbe occurred around 11:40 a.m.[11] According to Arwood's own recollection, Kolbe told Arwood that he had just stopped a gray Toyota truck with a temporary paper tag on I-65. Kolbe said that the truck was occupied by two males and two females, and the occupants gave him conflicting stories as

---

[10] Arwood testified that he had hundreds of hours of training in commercial and passenger narcotics interdiction, roadside interviewing, and narcotics investigation from the Drug Enforcement Administration (DEA) and other sources.

[11] Arwood testified that he is not certain whether the call was at 11:40 a.m. EST or CST.

to their destinations; as Arwood recalls the conversation, "one said Atlanta, one said Montgomery." When he began his testimony at the suppression hearing in this case, Arwood did not initially remember Kolbe's saying anything about rust or bolts. However, Arwood later testified that he recalled Kolbe's informing him "about rust build-up that he saw on the back seat area on the truck." He also remembered that Kolbe said that he had checked the undercarriage of the truck.

Arwood had begun that day working traffic on the southbound side of I-85 for a couple of hours and had made several stops. Thereafter, he followed another vehicle southbound, then turned at the 74 mile marker to go back northbound. Around 1:15 or 1:30 p.m.,[12] while Arwood's vehicle was stationed in the median facing northbound traffic, Arwood saw a gray Toyota Tundra coming down a long stretch of highway below the posted speed limit. Arwood estimated the truck's speed to be approximately 60 m.p.h. in a 70 m.p.h. zone, which he said caught his attention because the truck was traveling more slowly than "the average motoring public," and a slow speed could indicate that the driver was possibly tired or distracted in some way. When the Toyota passed by him, Arwood could not read the tag; later, he determined that the tag was composed of a piece of paper inside of "like maybe a plastic bag or plastic piece inside of another hard plastic cover." Arwood waited until it was safe to do so, then entered the northbound lane to follow the truck and monitor the occupants' driving behavior.

---

[12] Arwood testified that he believes that this was Central Standard Time.

Arwood was driving a marked Crown Victoria police cruiser. As he pulled closer to the Toyota, the truck, which had almost passed by an exit, "at the last minute … kind of darted off" the interstate. Arwood thought that this behavior was odd; he believed that the driver might be trying to avoid him. Arwood did not attempt to follow the truck off the exit because his car was in the inside passing lane, and he would have had to cross an extra lane to exit. Instead, Arwood continued straight and then waited for the truck in the far right-hand emergency lane of the interstate. While he waited, Arwood called officer Lawrence Howell, a Valley, Alabama law enforcement officer and K-9 handler, to inquire whether he was available in the area to assist. Arwood testified that he wanted Howell to see if he could "put eyes on the truck" – that is, to check whether the driver had simply parked the vehicle in order to wait and reenter the interstate later to avoid Arwood. Howell was a friend, and Arwood knew that he was likely available because Howell was a school resource officer and school was out.

Around five to seven minutes later, before Howell could arrive at the scene, Arwood observed that the Toyota was back on the interstate heading northbound toward Arwood's location, traveling in the left passing lane. As the truck passed Arwood, the driver activated his turn signal and pulled into the right lane. According to Arwood, during the process of changing lanes, the truck drove onto the white line on the right side of the highway. Arwood also testified that the information below the truck's tag number was not clearly visible to him because "there was some condensation built up on the piece of plastic and the outer shell of the tag bracket or tag cover at the time." Arwood decided to initiate a traffic stop

based on "improper tag display" and "improper lane usage" violations pursuant to Ala. Code §32-6-51[13] and §32-5A-88(1),[14] respectively. He turned on his blue lights.

Arwood testified that he stopped the Toyota at approximately 1:32 p.m. CST. The government has introduced into evidence the dash camera video of the stop, which begins as the Toyota is pulling over onto the side of the interstate. The video shows that, at the 00:00:33 mark,[15] Arwood called in to his dispatcher, gave his location, and read the dispatcher the numbers on the Toyota's temporary Texas plate. There is no indication in the video that dispatch responded to this call at this time. Arwood exited his patrol car and approached the passenger side. Arwood identified himself and told the driver, defendant Anguiano, the reason for the stop. Arwood explained that he had seen the truck cross the white line and indicated that he wanted to make sure that Anguiano was not falling asleep or texting and driving. Arwood also remarked that the vehicle had a temporary tag. Anguiano apologized and responded that he had just purchased the truck about two weeks before. Arwood then asked Anguiano for his license and vehicle information. Anguiano responded that he was helping his brother, who was sitting in the back seat,[16] with driving and that he did not actually have a license or any other form of identification.

---

[13] See n. 4, *supra*.

[14] "A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." Ala. Code §32-5A-88(1).

[15] The video introduced into evidence by the government does not display the date or time of day of the stop; rather, it shows only the amount of time that has elapsed since the beginning of the video. The time notations used in this Recommendation reflect the following format – hour: minute: second.

[16] The other passengers in the vehicle were defendants Quach and Diaz, the girlfriends, respectively, of defendants Anguiano and Verduzco.

Arwood then asked defendant Verduzco (Anguiano's brother), who was seated in the back seat, whether he had any identification. Anguiano interjected at that point, stating that they had just been stopped "in Alabama" "for the same thing." Arwood feigned a lack of knowledge about the prior stop and asked if they had received a warning. Anguiano responded that the officers had searched the truck with "dogs and everything." Anguiano then handed Arwood a piece of paper that Arwood recalled at the hearing as a bill of sale or proof of insurance. According to Arwood, Anguiano's hands were shaking visibly. Verduzco gave Arwood a paper photocopy of his Texas driver's license. According to Arwood, Verduzco was nervous; his hand shook when he extended his arm to provide Arwood his identification, behavior which Arwood testified was not common for a passenger who was in no danger of being cited for a traffic violation.

At the 00:02:37 mark, Arwood returned to his patrol car. At the 00:03:42 mark, Arwood's cell phone rang and he answered. Arwood testified that this call came from Deputy Kolbe. Kolbe asked whether Arwood had "found them" and Arwood responded that he had, and also told Kolbe that the vehicle had "exited on [him]." Kolbe responded that defendants had also "exited on" him. Kolbe and Arwood next discussed what appeared to be a gap between the tailgate and the bumper; according to Arwood, this gap drew his attention because, in his experience, false compartments on pickup trucks were common, especially in the bed area.

Arwood then told Kolbe that one of his "buddies" (meaning Officer Howell) was on the way and that the second officer would provide standby support. Arwood told Kolbe

he would likely gain consent and would "dig through it some more" and let Kolbe know if he came up with anything. Arwood ended the call with Kolbe at the 00:05:26 mark.

At the 00:06:00 mark, Arwood attempted again to make contact with dispatch.[17] The dispatcher did not respond. At the 00:07:34 mark, Arwood again contacted dispatch. The dispatcher acknowledged him a few seconds later and Arwood read her a series of numbers, presumably Verduzco's information and the tag number. Dispatch responded, "10-4."

While Arwood was speaking to Kolbe and attempting to contact dispatch, he was also waiting for Officer Howell to arrive. For his own safety, Arwood wanted to have backup in place before asking the driver to exit and join him in the patrol car. Arwood testified that he customarily writes traffic warnings inside his patrol vehicle because he has a camera inside; this allows him to see the recipient's body language better. In addition, in this instance, he had not been able to obtain any documents from Anguiano, and he needed further information to identify him. Also, traffic was loud, and there was something of a language barrier, so Arwood wanted Anguiano to write his information down. Further, Arwood wanted to speak with Anguiano separately from the other occupants of the vehicle so they did not have the chance to "all get their stories together." Given his intention to obtain further information from Anguiano inside his patrol car, Arwood awaited Howell's arrival before removing Anguino from the truck because, as he testified, "I knew I would

---

[17] Arwood testified that he called dispatch again upon reentering his patrol car and that he talked to Kolbe while he was awaiting a response from dispatch. The video footage, which shows that Arwood first called dispatch from his car prior to initiating contact with the defendants but received no response, and then called dispatch for a second time after he hung up with Kolbe, does not appear to support this version of events.

have to pull him from the vehicle to gather that information. I didn't want to have him sitting in the front seat of my car and me having three other people that I couldn't watch at that same time."

At the 00:09:43 mark, Officer Howell arrived and sat down in Arwood's passenger seat. Arwood explained to Howell that the vehicle had "exited on" him. Arwood added that he had since called Kolbe and learned that the defendants had done the same thing to him. Arwood's conversation with Howell was interrupted at the 00:10:02 mark.  At that point, dispatch called with the information Arwood requested about the vehicle's tag. At the 00:10:19 mark, Arwood resumed his conversation with Howell.  They discussed the gap between the tailgate and the bumper. Arwood told Howell that Kolbe had also noticed the gap. They speculated that drugs could be hidden in the "intake," which Kolbe had mentioned to Howell. Arwood added that the driver, defendant Anguiano, had no license or identifying information and that those facts provided a reason to prolong the stop. He also noted that Kolbe had told him that one of the males had been caught with drugs previously.  Arwood also told Howell about the defendants' "shady behavior" and speculated it could be because they were involved in sex trafficking. Arwood told Howell that defendant Anguiano had brought to his attention that they had been stopped in Alabama. Arwood further explained to Howell that there were only two pieces of luggage[18] in the truck and that defendants had told Kolbe they were going to buy clothes when they reached their final destination. Arwood also told Howell that he was going to "take a look

---

[18] Arwood's testimony at the suppression hearing indicates that he actually saw only one piece of luggage located in the bed of the truck.

at the gas can" and hypothesized that Anguiano's story about exiting and stopping to change drivers may have been an attempt to cover up an effort by defendants to avoid Arwood's attention on the interstate. He noted that the truck was purchased about three weeks before, but it had 9,000 miles on it.[19] Finally, Arwood told Howell that he was going to get Anguiano out of the car and "probably" ask for consent. Arwood added that if he did not find anything, he would still "run" the dog, as Kolbe felt confident he had missed something. Arwood testified that he gave Howell this information because, ordinarily, if someone was going to back him up, he wanted to communicate the knowledge he had of the traffic stop so the officer "doesn't just walk into it blinded."

At the 00:14:51 mark, Howell said he was going to go watch the passengers and emerged from the patrol car. At the 00:14:51 mark, Arwood walked to the Toyota and gestured for Anguiano to exit.  Arwood then told Anguiano to "come on back," because he needed to get some identifying information from him. At the 00:14:52 mark, Anguiano entered the patrol car and sat in the front seat. At this point, Arwood asked Anguiano where he was going. Anguiano responded that they were going to Atlanta, which was 16 hours from Laredo, Texas. Arwood also asked Anguiano to write his name and identifying information on a sheet of paper.[20] While Anguiano was writing his name, Arwood asked Anguiano how long he would be in Georgia. Anguiano responded that he would be there

---

[19] Arwood testified on cross-examination that the mileage of the vehicle was written on the sheet of paper that also contained information about when the vehicle was purchased – presumably, one of the documents that the driver had initially handed to him.

[20] Arwood testified that he had Anguiano write down his name, date of birth, and Social Security number because Arwood needed to provide the information to his dispatcher and he was having trouble understanding Anguiano.

for "a couple days – three to four days." Anguiano said that the defendants were on a road trip to surprise their girlfriends. Arwood then asked Anguiano whether he had a social security number. After Anguiano responded in the affirmative, Arwood asked him if he had ever had a license and if he had a current license. Anguiano confirmed to Arwood that his license had expired that year.

At the 00:17:56 mark, Arwood called dispatch. After identifying himself, Arwood asked dispatch if they were busy, and told dispatch that he had a name, date of birth, and social security number to give them. Arwood then relayed all the information, including Anguiano's Laredo, Texas address. The court does not have the benefit of hearing the dispatcher's response to Arwood, [21] but it appears that dispatch gave him a driver's license number. Arwood then asked dispatch if they had a picture of Anguiano that they could send him. At the 21:00 mark, Arwood hung up with dispatch.

Arwood asked Anguiano again for his name, address, and date of birth. Arwood asked for this information because dispatch had verified that there was a license in Texas with that name and date of birth, and had also provided a Texas address, and Arwood wanted to see if they matched. Arwood still had no way to positively identify Anguiano without a picture.[22] He wanted to identify Anguiano positively to see if "he is who he says

---

[21] Arwood had to communicate with the dispatcher by telephone rather than radio at some points during the stop because of what he described as an "open door" – that is, a period when radio traffic was restricted to prevent subjects inside a residence or business elsewhere from hearing the radio and discovering another officer's location when the officer was entering a building. It is unclear from the video when Arwood was on his phone, as opposed to his radio. The video does not capture dispatch's responses during this conversation, so this call may have been made on Arwood's cell phone – and Arwood testified that to the best of his knowledge, that was the case.

[22] Arwood never actually received a photograph during the stop.

he is." According to Arwood, "when we stop vehicles on the interstate they're not always moving narcotics, guns, money; it could be something like sex trafficking. … Also, he could have a warrant, he could be on the run."

After supplying his information to Arwood, Anguiano asked Arwood if he had any recommendation for things to do in Atlanta. According to Arwood, when he mentioned Six Flags, Anguiano did not seem interested because, he said, they had a Six Flags in Texas. Arwood also mentioned the Atlanta aquarium. Arwood then confirmed more of the same personal identifiers already given to dispatch – Anguiano's zip code and birth date, for example.[23] At the 00:23:16 mark, Arwood asked Anguiano if Verduzco was the owner of the Toyota. He testified that he made this inquiry to determine who the vehicle belonged to because it could be stolen, and also because he wanted to find out who owned the truck in order to ask for consent to search. Anguiano responded that his mother was actually the owner, but that Verduzco had been driving because he had the current driver's license or permit. Arwood testified that he believes that Anguiano also told him that his mother had given the truck to his brother. Anguiano then asked if it was "actually a big deal" that the Toyota had a paper tag. Arwood explained to Anguiano that paper plates can easily be

---

[23] Although the court does not have the benefit of video footage of Arwood himself during this conversation, as best the court can surmise, it appears that Arwood is writing the traffic warning at this time, as Arwood asks Anguiano to repeat several pieces of information that Arwood has already given to dispatch. There are also several long pauses which suggest that Arwood is engaged in an activity other than talking to Anguiano – presumably, writing the warning ticket. In testimony, Arwood did indicate that at least the conversation about the suitcase noted below took place while he was "issuing his warning and waiting for information."

falsified. Anguiano responded that the officer who had stopped them earlier in the day had mentioned that paper tags could be manufactured.

Anguiano then volunteered more details about the first stop. He told Arwood where the stop occurred – approximately 89 miles away from Montgomery – and said that the officer had been "pissed off" and "really mad" and had searched the vehicle both himself and with a dog. Arwood responded by saying the following at the 00:28:03 mark: "I'll be honest with you. I am little bit suspicious of the whole trip. The reason I say … is you are driving 16 hours and you don't really have a destination you are going to."  Arwood then asked if the group had a hotel room reserved. Anguiano responded that they had a reservation at the "Hilton downtown." Arwood remarked that he had noticed there were four people in the car, but there were only two suitcases[24] in the truck. Anguiano said that he had only brought "two changes," but that they were thinking about going shopping for clothes while in Atlanta. Arwood testified that Anguiano's account of the trip during this part of the conversation drew his attention for two reasons: (1) because driving 15 to 16 hours from Laredo "seemed like a long way to drive to have no set destination, to have no travel plans already in place …" for what had been described as a couple, three or four-day trip, and (2) because Arwood saw only one[25] suitcase in the back of the truck. Also, Arwood was aware that the trip was "from a source city to hub area." Specifically, he testified later that Laredo was "a source area in Texas where multi kilograms of narcotics are smuggled

---

[24] See n. 17, supra. Government's Exhibit 7, a contemporaneous photograph depicting the bed of the truck, shows only one suitcase.
[25] Id.

in from Mexico and distributed from that point to various cities," and that, according to the DEA, Atlanta is "the drug hub of the south."

At the 00:28:54 mark, Arwood asked Anguiano if there was anything illegal in the vehicle. Anguiano said there was not. Arwood then asked Anguiano if he would give Arwood "consent to also search the vehicle." Anguiano responded, "You can search the truck," at approximately the 00:28:53 mark. Arwood continued talking to Anguiano and explained that he understood the other officer's suspicions, especially given that Anguiano had no identification. Arwood told Anguiano that while the name he had given was a current name and was associated with a Texas driver's license number, he had no way of confirming at that moment that he was, indeed, Anguiano. Arwood then asked Anguiano how many miles were on the truck. Anguiano said there were around 10,000 miles on the truck.

At the 00:31:10 mark, Arwood told Anguiano that he had written a warning and explained the warning. He cautioned Anguiano that he should not drive if he did not have his license, but added that if the driver is too tired, that person should not drive. Anguiano replied that he was only driving because his brother had driven "basically all night." Arwood then asked if they had gotten any fuel lately. Anguiano indicated that he had stopped a couple of miles back and fueled up. Arwood inquired whether Anguiano had a full tank, and Anguiano said that he did not; he had put in only $20 worth of gas. Arwood testified that the decision not to fill up made no sense to him, and he felt again that Anguiano actually had probably exited to avoid him. As to the traffic infractions, Arwood testified that he gave Anguiano the written warning at 00:33:03. At the 00:33:06 mark,

18

Arwood said to Anguiano, "You've obviously given me consent to search the vehicle, correct?" Anguiano answered in the affirmative.[26] Arwood testified that he asked this question "as I was handing him his warning" in order to confirm that he had consent to search.

Arwood then directed Anguiano to stand in front of the patrol car while he asked Verduzco some questions. At the 00:33:37 mark, Anguiano took his place in front of the patrol car. At the 00:34:30 mark, Arwood asked Verduzco to have a seat in the passenger side of the car. According to Arwood, he wanted to give Verduzco back the information that he had previously provided, and he also wanted to ask him for consent to search, since he understood from Anguiano that the truck had been given to his brother. Arwood asked Verduzco what their plan was. Verduzco responded that they were going to Atlanta to surprise their girlfriends and that they planned to stay at the Hilton – or Hamilton – downtown.  Arwood asked Verduzco if there was anything illegal in the car and Verduzco responded, "No, you can check if you want." At the 00:36:47 mark, Arwood confirmed consent with Verduzco. Arwood said to Verduzco, "I would like to search the vehicle." Verduzco responded, "Yeah, go ahead." Arwood then asked how many pieces of luggage the travelers had, and whether they had changes of clothes. Verduzco responded that his brother did not bring clothes, but that they were going to shop in Atlanta. Arwood noted that this was different from Anguiano's statement earlier that he had brought two changes of clothes, and he believed that the brothers were being deceptive. Arwood then asked

---

[26] Arwood testified that he remembers Anguiano "saying yes and maybe giving me a head nod."

Verduzco to stand in front of the patrol car with Anguiano. By the 00:38:05 mark, all four defendants were standing on the side of the road in front of the patrol car.  Officer Howell took up a position by the defendants and Arwood began his search of the Toyota.

At the 00:45:00 mark, Arwood returned to the patrol car. At the 00:45:47 mark, Arwood began talking to an unidentified person. Though the video does not capture the other person's speech and Arwood does not identify the person to whom he is speaking, Arwood testified that he called a drug interdiction instructor. Arwood asked the instructor if he knew of any hiding places in a Toyota Tundra. Arwood also asked the instructor if Deputy Kolbe had called him about this truck and added, "It's a good stop in as far as their stories don't make sense … ." Arwood hung up with the instructor at the 00:50:53 mark.

At the 00:51:21 mark, Arwood called Deputy Kolbe. Again, the video does not capture Kolbe's speech; however, Arwood's statements to Kolbe are audible. Arwood asked Kolbe if he had been able to get the back seat to come down.  After a brief discussion regarding the back seat, Arwood told Kolbe that he would update him if he came up with anything. Arwood hung up with Kolbe at the 00:52:30 mark.

At the 00:52:35 mark, Arwood returned to the truck and resumed his search.  At the 1:01:20 mark, Arwood told Howell to "get Goose [Howell's drug detection canine] out."[27] Arwood then let the tailgate to the truck down and opened the passenger side door. While

---

[27] Goose's trainer, Ricky Farley, the owner and operator of the Alabama Canine Law Enforcement Training Center – whom the parties stipulated to be an expert – testified that Goose was trained and certified to detect the odor of narcotics, including cocaine and heroin, on the date of the stop. According to Farley, Goose had an internationally recognized PSP certification for detection dogs, which, according to Farley, "is considered in the industry as far as industry standards to be the hardest to pass … ."

Howell was retrieving Goose, Arwood asked Anguiano if they had had the back seats out at any time. It is impossible to hear the majority of Anguiano's response on the video, but he indicated the location of the jack. Arwood then told Anguiano that he could go back to his position in front of the patrol car.

At the 1:02:35 mark, Howell brought Goose to the passenger side of the truck. The video does not provide an uninhibited view of the canine search; the viewing angle is partially blocked by the defendants, who were standing in front of the patrol car. It appears that Howell began the canine search on the passenger side of the truck, led Goose around the front of the truck, and then brought Goose to the back of the truck. Goose jumped onto the bed of the truck and then back out. Howell led Goose back to the passenger side of the truck. At the 1:04:08 mark, Arwood said to Howell: "Try to present this … uh … try to present that little crack right there … yeah, where he's going right there … up there behind the seat … ." It appears from the video that Arwood then pointed a flashlight in the direction of the open passenger side door; in his testimony at the suppression hearing, Arwood confirmed that he shined his flashlight into the back seat of the truck.[28] The video then shows Goose standing on his hind legs, presumably with his front paws on the vehicle; however, the court cannot determine whether the dog's front paws were actually inside the

_____

[28] According to Farley, handlers are taught to present "natural cracks and openings" to a canine to sniff. Farley testified that "[o]dor doesn't come out of solid surfaces so there's no need to present a door or a hood or trunk … . You present all natural cracks and openings, including the under well and fender wells of [the] vehicle." Depending on how excited the dog is, the handler would present such natural cracks and openings "on the second pass," after the officer allows the dog to travel around a vehicle on its own – that is, walking in front of the handler. Farley said, "however, some dogs you'll start presenting on the first pass." Farley also testified that some handlers use pointers and laser finders, and the dog follows the light.

Toyota because the view is blocked. Arwood testified that he asked Howell to present the area "where the rear wall [of the truck] and the floor meet. Because of the bolts that I saw the tool marking on,[29] I thought the compartment could very well be in the floor. So I wasn't sure if it was the floor or wall, so if he presented the crack it would cover both." The court infers from this testimony that the canine was, at least in part, actually inside the vehicle.

At the 01:04:28 mark, the dog sat down on the grass beside the open passenger-side door. The dog then stood back up and exhibited signs of agitation. At the 01:05:21 mark, Arwood remarked to Howell that he thought they needed to take the Toyota to King Ford, a local Ford dealership. Arwood testified at the hearing that he wanted to take the truck to King Ford, which was two to three miles south of where the stop took place, because it had the closest shop, and the mechanics there could help him remove the seat. Howell then took Goose away.

At the 1:05:47 mark, Arwood told Anguiano to have a seat in the front of the patrol car. Arwood told the two female travelers that they could sit in the Toyota and turn the air conditioning on. At the 01:05:58 mark, Arwood joined Anguiano in the patrol car and informed him that the dog had shown "indications to odor of narcotics." He then asked Anguiano to follow him and Howell to a shop, where he intended to do a more thorough search. Arwood explained to Anguiano that when the dog sat down, that was "his indication

---

[29] Arwood also testified that at some point earlier in the traffic stop he had noticed the tool markings on the seat bolts, which led him to believe that the bolts had been taken out recently. He also observed hand prints on the rear wall of the truck. At that time, he had pointed out the tooling to the driver and asked if he had had the rear seat out.

that he smelled the odor of narcotics."[30] Arwood said to Anguiano that he wanted to do a "further search" and told him that either Anguiano could drive the truck to the shop, or he would. He also explained to Anguiano that, given the canine indication, he had probable cause to search the vehicle more thoroughly. He told Arwood that he wanted to take the bolts out of the back seat, and here were a few more things he wanted to see. Anguiano responded, "Sure." Anguiano later stated he "wished [he] could be on [his] way," but also confirmed that he wanted to cooperate and drive the truck. Arwood's conversation with Anguiano ended at the 01:08:40 mark.

Anguiano walked to the Toyota and Verduzco joined him inside. Arwood then pulled onto the interstate and began driving.[31] At the 01:14:26 mark, Arwood arrived at the shop belonging to the Ford dealership and parked the patrol car.  At the 01:17:24 mark, the Toyota arrived at the shop. At the 01:31:45 mark, someone drove Arwood's car into the shop and parked it so that the dash camera faced the Toyota. The video ends at the 01:43:40 mark.

During the search of the truck at King Ford, Arwood found 14 kilo sized bricks of narcotics stacked inside the back wall of the truck after an access panel was removed. Ten of the packages contained cocaine; four contained heroin.

---

[30] The precise time of the alert is not entirely clear. The video shows Goose sitting down at 01:04:28. However, during Arwood's testimony, counsel stopped his presentation of the video at the 01:08:04 mark and asked Arwood, "at this point did the canine indicate whether an odor of narcotics was in the vehicle?" Arwood replied, "yes." Either way, it is apparent that the dog did alert to the odor of narcotics.

[31] The audio component of the video is turned off at this point.

**Discussion**

There are four pending motions to suppress. In her motion, defendant Quach seeks to suppress the following: "all tangible evidence and statements, in addition to any derivative evidence or 'fruit' of those items and statements obtained by the United States as a result of the … traffic stop and search," and "all items and information obtained as a fruit of the execution of the search [of the] 2014 Toyota Tundra." (Doc. 86 at 1). Defendant Diaz seeks to suppress the following: "(1) any statements allegedly made during or after the traffic stop on July 7, 2016; (2) all of the tangible evidence obtained by the United States as result of this traffic stop and subsequent searches of the vehicle; and (3) all 'derivative' evidence (or 'fruit') obtained by the United States as a result of the July 7, 2016 traffic stop and subsequent searches of the vehicle (including but not limited to evidence obtained from the cell phones found in the vehicle.)" (Doc. 94 at 4). Defendants Verduzco and Anguiano seek to suppress the following: "(a) All tangible evidence seized on or about July 7, 2016 from the defendants or from the 2014 Toyota Tundra … as a result of the traffic stop which occurred on I[-]85 in Chambers County, Alabama; (b) All statements made, whether oral or written, and such other actions of the defendant, if any, at the time of and subsequent to the traffic stop; (c) The testimony of law enforcement officers, or their agents, and all other persons working in connection with such officers and agents, and all persons present at or near the location of the traffic stop and subsequent search of the vehicle in regard to any statement or evidence acquired or seized … ." (Doc. 96 at 1; Doc. 97 at 1).

24

The defendants raise several arguments in their motions to suppress. The court takes each in turn.

1.  <u>Did Deputy Arwood have probable cause or reasonable suspicion to initiate the traffic stop?</u>

All four defendants contend that Arwood lacked probable cause or reasonable suspicion to initiate the traffic stop. The government contends that Arwood had probable cause to stop the defendants' vehicle because "defendant Anguiano crossed the fog line as he travelled [sic][,] thereby committing a traffic violation." (Doc. 156 at 2).[32]

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. Amend. 4. It is well-settled that "[a] traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment." <u>Heien v. North Carolina</u>, __ U.S. __, 135 S.Ct. 530, 536, 190 L.Ed.2d 475 (2014). "As a general proposition, a traffic stop comports with the Fourth Amendment 'where the police have probable cause to believe a traffic violation has occurred.'" <u>United States v. Lopez</u>, 2017 WL 373454, *4 (S.D. Ala. Jan. 25, 2017) (quoting <u>Whren v. United States</u>, 517 U.S. 806, 810 (1996)).

The record reflects that Arwood initiated a traffic stop of the defendants' vehicle after he personally observed the vehicle travel across the white line marking the right boundary of the lane, sometimes called the fog line. As noted above, Ala. Code § 32-5A-

---

[32] As set forth above, Arwood also testified that when the defendants' vehicle initially passed him – prior to exiting and reentering the interstate – he could not read the vehicle's tag. This "improper tag display," he testified, provided a second justification for the stop, pursuant to Ala. Code § 32-6-51 (1975).

88(1) (1975) states, *inter alia*, that "[w]henever any roadway has been divided into two or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply: (1) a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."[33] There is no video evidence of the vehicle's alleged movement over the fog line. However, in light of Arwood's testimony regarding his eyewitness observations – and the fact that defendants offer no evidence to controvert Arwood's testimony – this court concludes that a reasonable officer in Arwood's position could have stopped the defendants' vehicle for crossing over the fog line.[34]  See United States v. Gonzalez, 2009 WL 2432732 (M.D. Ala. Aug. 7, 2009)(in spite of what defendant argued was unclear video evidence, holding that in light of the video and the officer's testimony regarding what he personally saw, there was sufficient evidence to support the existence of probable cause to stop vehicle for crossing the fog line); Ramos, 2017 WL 26905 at *3 (despite "inconclusive" video evidence, holding that based on the officer's credible testimony about his eyewitness account, the magistrate judge correctly concluded

---

[33] Though the government did not reference this statute, the court notes that under Alabama Code § 32-6-49.3(21)(b), "improper or erratic traffic lane changes" also constitute a traffic violation.

[34] While there is no video evidence of the alleged traffic violation, the dash camera captured a conversation between Arwood and the driver, defendant Anguiano, regarding the infraction. Arwood explained to Anguiano that he observed the vehicle crossing the fog line and expressed concern about Anguiano's safety. Anguiano neither denied that he committed a traffic violation nor took issue with Arwood's observation. While not determinative that the traffic violation occurred, this evidence supports Arwood's account of the events preceding the stop. See United States v. Ramos, 2017 WL 26905, *3 (M.D. Ala. Jan. 3, 2017) ("[I]n the conversation captured on the video, Defendant does not deny the traffic violation … nor does Defendant seem to take issue with [the officer's] account … . [T]hese details in the video tend to support [the officer's] account[t]."

that there existed to probable cause to stop defendant for crossing striated lines on roadway). See also United States v. Johnson, 2005 WL 1412117, *2 (11th Cir. 2005) (fact that driver was swerving was sufficient justification to stop vehicle to ensure that driver was neither drunk nor sleeping); United States v. Harris, 928 F.2d 1113, 1116-17 (11th Cir. 1991) (same).  Accordingly, the traffic stop was constitutionally justified at its outset.[35]

The court is not persuaded by defendants' arguments that the traffic stop was pretextual and thus, violated the Fourth Amendment. Defendants argue, in varying fashion, that Arwood intended – from the time he received the phone call from Baldwin County Deputy Kolbe – to stop and search the defendants' vehicle, and that the stop for one or more alleged traffic violations was merely a pretext for a search for drugs or evidence of other illegal activity.[36] However, the Supreme Court has held that the "constitutional reasonableness of traffic stops [does not] depend [] on the actual motivations of the individual officers involved." Whren v. United States, 517 U.S. 806, 813 (1996). The law is clear that "where objectively reasonable conditions permit a stop, 'the officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable

---

[35] As noted above, Arwood testified that he also initiated the traffic stop because of what appeared to be an "improper tag violation." See Ala. Code § 32-6-51 (1975). Defendants make much ado about this second proffered justification for the traffic stop. Defendant Diaz, for example, argues in her supplemental brief that, given the speed at which the vehicle was traveling and Arwood's location on or near the interstate, Arwood could not have been able to see the tag clearly enough to notice a violation. (Doc. 152 at 3). The court does not reach the question of whether there was probable cause to stop the vehicle for a tag violation, as it has already determined that probable cause existed based on the lane usage violation. However, it bears noting that defendants offer no countervailing evidence to contradict Arwood's testimony of a tag violation.

[36] While Anguiano and Verduzco raise this argument in their motions to suppress and supplemental briefs, they do concede in their supplemental briefs that, based on Whren and its progeny, "the current state of the law regarding traffic stops holds that pretext and subjective intent is of no moment in the [c]ourt's Fourth Amendment inquiry."  (Doc. 154 at 11; Doc. 157 at 12-13).

behavior under the Fourth Amendment." U.S. v. Gonzalez, 383 Fed. Appx. 933, *1 (11th Cir. 2010) (quoting United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008), *cert denied*, __U.S. __, 129 S.Ct. 569, 172 L.Ed.2d 433 (2008)). Accordingly, "as long as an officer had probable cause to believe that a traffic violation occurred," the traffic stop will be deemed lawful. United States v. Joseph, 611 Fed. Appx. 946, 947 (11th Cir. 2015) (citing Wren at 810). This court has already determined that probable cause existed for the initial traffic stop, and because the law is clear that subjective intent is irrelevant in determining whether the initial stop was constitutionally permissible, the court finds no Fourth Amendment violation.

The court is likewise unpersuaded by the defendants' arguments that Arwood's testimony regarding the events of the day and his reason for stopping defendants' vehicle lacks credibility. Defendants raise a litany of concerns about Arwood's statements,[37] but offer no evidence to refute his testimony. Instead, the court is left with only bare suppositions, which in this case the court finds insufficient to tip the balance in favor of finding Arwood's testimony incredible or untrustworthy. Arwood's testimony at the suppression hearing was not so "*exceedingly* improbable," "unbelievable," or "contrary to the laws of nature" that "no reasonable factfinder could accept it." See United States v.

---

[37] For instance, defendant Diaz questions whether the court should credit Arwood's testimony that Kolbe's call was not the sole motivating factor for his going into work and calls such testimony "dubious" since Arwood testified he had a flexible work schedule. (Doc. 152 at 5-6). Anguiano echoes this concern and also argues that Arwood's testimony that he was not "actively looking for the [d]efendants['] truck" is not believable in light of the conversation he had with Kolbe earlier in the day. (Doc. 154 at 14-15). Given the holding of Wren v. United States, Arwood's motivation is not material to the court's analysis.

Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (emphasis in original). Thus, the court accepts as credible Arwood's testimony and has no reservations relying on it in determining that the initial stop was constitutional.

2.  Did Deputy Arwood conduct a custodial interrogation prior to issuing Miranda warnings, and if so, did the violation taint or invalidate defendants' subsequent consent to search?

Defendants maintain that Arwood impermissibly conducted a custodial interrogation prior to issuing Miranda[38] warnings and that any statements[39] elicited during this custodial interrogation should be suppressed. Defendants further argue that their consents to search – which were given to Arwood prior to their receiving Miranda warnings – were invalid. The government responds that while defendants were detained during the traffic stop, they were neither in custody nor subjected to official interrogation prior to being advised of their Miranda rights.[40]

A traffic stop constitutes a seizure. Delaware v. Prouse, 440 U.S. 648, 653 (1979). However, "[r]oadside questioning of a motorist who was pulled over in a routine traffic stop [does] not constitute custodial interrogation [under Miranda]." Howes v. Fields, 565 U.S. 499, 509-510 (2012) (citing Berkemer v. McCarty, 468 U.S. 420, 423, 441-42 (1984)). "As the Supreme Court has explained, '[S]uch detention does not sufficiently impair [the

---

[38] Miranda v. Arizona, 384 U.S. 436 (1966).

[39] Defendants do not specify the "statements" they seek to suppress or when those statements were allegedly made. Instead, defendants seek to suppress "all" or "any" statements obtained as a result of the subject traffic stop and search. The only statements noted by the government at the suppression hearing were statements provided by Anguiano and Verduzco "at the roadside" – that is, prior to the removal of the truck to King's Ford.

[40] Defendants were read their Miranda rights after the drugs were seized.

detained person's] free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.'" U.S. v. Charlestain, 2012 WL 1947328, *7 (S.D. Fla. May 8, 2012) (quoting Howes at 509-510). A stopped motorist may be considered "in custody," however, "if he is subjected to treatment during the traffic stop that amounts to a restriction of freedom to a degree associated with a formal arrest." United States v. Crawford, 294 Fed. Appx. 466, 473 (11th Cir. 2008). This notwithstanding, the Eleventh Circuit has noted that "[a] reasonable person knows that he is not free to drive away from a traffic stop until it is completed, just as a reasonable person knows that he is not free to walk away from a *Terry* stop until it is over." United States v. Acosta, 363 F.3d 1141, 1149 (11th Cir. 2004). Indeed, "[i]f the lack of freedom to leave were decisive, which is to say every phrase in the *Miranda* opinion is to be applied literally, then all traffic stops as well as all *Terry* stops generally would be subject to the requirements of that decision." Id. The Supreme Court has resoundingly held that is not so. See Berkemer, 468 U.S. 420.

Defendants point to the following facts as evidence they were in custody prior to their receipt of Miranda warnings: (1) the male occupants of the car were required to exit the vehicle and remain outside the vehicle while being questioned and during the search, and the female occupants were made to exit the vehicle before the search;[41] (2) defendants were instructed to stand on the side of Interstate 85 North during the event;[42] (3) Verduzco

---

[41] See Doc. 86 at 8.
[42] Id.

and Anguiano were told to stand in front of the patrol car and sit in the patrol car;[43] and (4) Anguiano was compelled to drive the truck to the Ford dealership.[44]

While these circumstances might have caused defendants to feel they were not at liberty to terminate the questioning and leave the scene, "these acts did not exert pressure on [defendants] that sufficiently impaired [their] free exercise of [their] privilege against self-incrimination, requiring that [they] be warned of [their] constitutional rights." U.S. Dericho, 2015 WL 5687766, *6 (M.D. Fla. Sept. 25, 2015) (though defendant was required to exit vehicle, told where to stand, and questioned during prolonged traffic stop, he was not held at gunpoint, handcuffed, or placed in the backseat of the officer's patrol car and was not in custody as contemplated by Miranda); United States v. Gonzales, 2007 WL 1175870, *4-5 (E.D. Mo. April 20, 2007)(holding that even though officers had the driver agree to move the vehicle from a parking lot to the police department for a more detailed search – because a canine had alerted – the defendant still was not in custody for Miranda purposes). Thus, Miranda warnings were not required at the time that the acts at issue took place. Accordingly, defendants' motions to suppress any statements made prior to Miranda warnings are due to be denied.

To the extent that defendants argue that the consents to search given by Anguiano and Verduzco were somehow tainted or invalidated because they were given prior to

---

[43] Doc. 96 at 14; Doc. 97 at 20.

[44] Id. The video actually reflects that Arwood told Anguiano that either he could drive the truck to the shop or Arwood would. Thereafter, Arwood asked, "Do you want to cooperate?" and Anguiano said, "Yes, sir," and proceeded to drive the vehicle.

<u>Miranda</u> warnings, this argument fails, as no such <u>Miranda</u> warnings were required. <u>See</u>
<u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 231-32 (1973) (failure to give <u>Miranda</u> warning
does not render consent invalid if defendant is not subject of custodial interrogation).[45]

3. <u>Did Deputy Arwood impermissibly prolong the stop?</u>

Defendants argue that Arwood impermissibly prolonged the stop beyond the time
reasonably required to complete the mission of issuing a warning for the alleged traffic
violation. The government responds that Arwood had reasonable suspicion to extend the
stop lawfully.

The acceptable duration of a police detention in the context of traffic stop is
determined by the seizure's "mission" – *i.e.,* the reasons the traffic stop was permissible
under the Constitution in the first place. <u>Rodriguez v. United States</u>, 135 S. Ct. 1609, 1614
(2015). In other words, a lawful traffic stop becomes unlawful "if it is prolonged beyond
the time reasonably required to complete the mission of issuing a ticket for the violation."
<u>Rodriguez v. United States</u>, 135 S. Ct. 1609, 1612 (2015) (quoting <u>Illinois v. Caballes</u>, 543
U.S. 405, 407 (2005) (brackets and quotation marks omitted). "Authority for the seizure
thus ends when tasks tied to the traffic infraction are – or reasonably should have been –
completed." <u>Id.</u> at 1614 (internal citations omitted). An officer may, however, extend a

---

[45] Also, to the extent that defendants argue that the consent they gave to Arwood was somehow
involuntary or coerced due to the fact that they had not yet been read their <u>Miranda</u> rights, this
argument is also without merit. Defendants offer no legal authority for such a conclusion, and the
court finds no evidence that the consent given by defendants Anguiano and Verduzco was not
voluntary. It also bears noting that Anguiano gave verbal consent to search at the 00:28:54 mark;
thus, to the extent that defendants argue that Anguiano did not consent until the 00:33:06 mark –
when Anguiano confirmed to Arwood that he previously had given his consent for Arwood to
search the vehicle – the argument is rejected as unsupported by the record.

traffic stop if the extension itself is independently supported by reasonable suspicion. Id. at 1615.

This does not mean that officers run afoul of the Fourth Amendment if, during the course of a stop, they ask questions or make inquiries unrelated to the reason for the traffic stop. Officers are permitted to "[c]onduct certain unrelated checks during an otherwise lawful traffic stop." Rodriguez at 1615. Officers simply cannot "do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id. In other words, when a traffic stop is supported by probable cause, an officer has "a right to pursue inquiries unrelated to the traffic violation as long as those inquiries did not 'measurably extend the duration of the stop.'" Ramos, 2017 WL 26905, *3 (M.D. Ala. Jan. 3, 2017) (quoting Rodriquez, 135 S.Ct. at 1615). "A few questions asked while 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance,' for instance, are well within an officer's latitude." Id. (quoting Rodriguez at 1615). Accordingly, reasonable suspicion to prolong a stop may be developed during the course of making unrelated checks, provided those inquiries do not "measurably" extend the stop beyond the time required to complete its mission. See id.

In determining whether reasonable suspicion exists, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 271 (2002) (internal citation omitted); United States v. Cortez, 449 U.S. 411, 417 (1981). "It is clear that an inchoate and unparticularized suspicion or hunch

of criminal activity is not enough to satisfy the minimum level of objectivity." United States v. Perkins, 348 F.3d 965, 970 (11th Cir. 2003) (internal citations and quotations omitted).  "The relevant inquiry in evaluating the presence of reasonable suspicion is not whether the particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts." United States v. Lozano, 2016 WL 2757403, *3 (S.D. Ala. May 12, 2016) (citing United States v. Tapia, 912 F.2d 1367, 1370-371)(quoting, in turn, Terry v. Ohio, 392 U.S. 1, 21 (1968)).

"Reasonable suspicion can be determined from the collective knowledge of the officers involved in the stop." United States v. Heath, 622 Fed. Appx. 843 (11th Cir. 2015) (citing United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989)). Officers are permitted to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"  United States v. Diaz-Fonseca, 2013 WL 3147903, *7 (S.D. Fla. Jun. 19, 2013) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting, in turn, United States v. Cortez, 449 U.S. 411, 418 (1981)). Moreover, "officers may use a tip to develop reasonable suspicion, so long as the tip exhibits 'sufficient indicia of reliability.'" Id. (quoting Florida v. J.L., 529 U.S. 266, 270 (2000) (quoting, in turn, Alabama v. White, 496 U.S. 325, 332 (1990)). In White, for example, the Supreme Court concluded that "where an anonymous tip correctly predicted not only 'easily obtained facts and conditions,' but also the suspected transporter's 'future behavior' – the time she would leave a particular apartment building and the location to which she would be traveling – it was sufficiently reliable to provide officers reasonable suspicion to stop her vehicle." Id.

(quoting White, 496 U.S. at 331-32). See also Woods, 385 F. App'x 914, 918 (11th Cir. 2010) (per curiam) (where confidential informant accurately provided the color, make, and model of the suspected drug trafficker's car, and that he would be at a particular location at noon that day, officers had reasonable suspicion to stop vehicle matching said description).

While the court has been unable to find a recent Eleventh Circuit case directly on point, several courts have held, post-Rodriguez, that when the seizing officer has advance knowledge of suspected criminal activity, this information – which is already known to the officer at the time of the stop – can be combined with information obtained during the course of completing the mission of the stop in order to create reasonable suspicion sufficient to justify prolonging the detention. These cases are consistent with the Eleventh Circuit's practice of allowing sufficiently reliable tips to be considered in the reasonable suspicion calculus.

For example, in United States v. Heald, 165 F. Supp. 3d 765 (W.D. Ark. 2016), a concerned citizen contacted a police department detective and reported that her neighbor routinely left for periods of time and upon returning, backed his car into his driveway and removed panels from his car. The informant added that a short time afterward, cars would typically visit the house at all hours. The detective called a fellow detective, and the two investigated the house. The detectives followed the neighbor to the supermarket, where they suspected he was buying plastic "baggies." Once he left the supermarket, the detectives witnessed several traffic infractions. One of the detectives communicated the infractions to another officer on the road, who pulled in front of the neighbor and initiated

a traffic stop. The stop was captured on video by a dash camera. By the 16-minute mark of the video, it was clear that the detaining officer had turned his attention from investigating the traffic infraction to detaining the defendant until a K-9 unit could arrive to further the narcotics investigation.

Defendant filed a motion to suppress, arguing that the stop was impermissibly extended beyond the time necessary to investigate and issue a citation for the traffic infraction(s).  The court disagreed. First, the court explained that "with an ordinary traffic stop, where the seizing officer has no advance knowledge of any possible criminal activity, the officer's reasonable suspicion must necessarily be premised on facts learned during the stop … . Where the seizing officer has advance knowledge of suspected criminal activity, however, reasonable suspicion can be based on this knowledge in addition to facts learned during the stop." Id. at 775-776. The court explained that the concerned citizen's reliable tip, communicated to the detective and then to the detaining officer, provided the detaining officer with knowledge sufficient to constitute reasonable suspicion. Taking a totality of the circumstances approach, the court found that "the detectives' first-hand observations, together with their reasonable reliance on the non-corroborated portions of the concerned citizen's tip, created reasonable suspicion of criminal activity." Id. at 776. Moreover, the court found that this reasonable suspicion was attributable to the detaining officer either through his communications with the detectives, or through the collective knowledge doctrine. The court ultimately held the detaining officer had reasonable suspicion of criminal activity necessary to prolong the duration of the defendant's seizure beyond the time necessary to investigate a traffic infraction.

Similarly, in United States v. Browne, 2016 WL 6602636 (D. Mon. Nov. 8, 2016), a member of the Royal Canadian Mounted Police called a special agent with the Department of Homeland Security Investigations Division ("HSI") and provided a tip that he expected that a large amount of cocaine was going to be smuggled through Montana into Canada. The Canadian officer told the American agent that a blue Chevrolet Avalanche with either California or British Columbia license plates would be driving through or near Kalispell, Montana, soon and that a man named Matt would be driving the truck, which would have a false bed loaded with cocaine. The HSI agent sent a text message to other law enforcement officers in the area and relayed some, but not all of the information he learned from the Canadian officer. The agent advised the officers to be on the lookout for the subject vehicle and driver.  This information was then relayed to other law enforcement officers, including a detective with the Lincoln County Sheriff's Office. A few days later, the detective located a vehicle matching the tipster's description. The detective called a deputy with his own department and told him to park at the bottom of a hill and see if he could catch the truck speeding. The deputy succeeded and initiated a traffic stop.  The deputy had a brief initial encounter with the defendant. By the time the initial encounter concluded, the detective had arrived on the scene and the deputy relayed to him what he had witnessed during the encounter – i.e., that the defendant had been visibly shaking and his throat had been pounding on the side of this neck. The detective then called the HSI agent and confirmed the information from the tip. The deputy returned to the patrol car to call dispatch and the detective approached the truck to talk with the defendant. The detective introduced himself and began asking questions about his travel

plans. After getting "no hits" from dispatch, the deputy exited the vehicle and joined the detective as he questioned the defendant. After this conversation concluded, the detective began calling law enforcement officers for a canine unit. Due to the rural area in which the stop took place, the canine did not arrive until 45-60 minutes later.

Defendant filed a motion to suppress, arguing that the stop had been impermissibly prolonged. While the court found that the investigation of the traffic stop had ceased, at the earliest, the moment the deputy stepped out of his patrol car to assist the detective with questioning, the court held that by the time the detective first spoke to the defendant, he had independently corroborated specific factual details supplied in the reliable tip. Id. at *4-5. Accordingly, the court found that it was reasonable for the detective to prolong the traffic stop briefly for further investigation based on the corroborated facts from the tip, and the deputy's description of the defendant's demeanor in the initial encounter. Id. at *5.

Here, Arwood also had independent, articulable and reasonable suspicion for prolonging the traffic stop. Prior to stopping the defendants lawfully for a traffic infraction, Arwood knew at least the following facts from his conversation with Kolbe: (1) there was a Toyota Tundra traveling on the interstate from Laredo, Texas – which, based on Arwood's training and experience in law enforcement and drug interdiction, he knew to be a "source" city; (2) the vehicle was possibly traveling to Atlanta, Georgia, which Arwood also knew to be a "hub" city; (3) when questioned by a deputy sheriff during a traffic stop, the men in the truck had provided inconsistent statements regarding their travel plans – *i.e.,* one defendant said they were traveling to Atlanta and the other defendant said they were traveling to Montgomery; (4) one of the occupants of the vehicle had a prior drug arrest;

and (5) during the course of an unsuccessful search for drugs in the truck, Kolbe had seen rust build-up on the back seat, which Arwood believed indicated that the back seat might have been taken out of the vehicle.

As to Arwood's own observations, the record reflects that, subsequent to his conversation with Kolbe, Arwood saw the truck traveling down the interstate and confirmed that the direction of travel was toward Atlanta, despite the fact that one of the occupants had told Kolbe that the travelers' destination was Montgomery. Arwood testified that the truck suddenly "exited on" him, which added to his suspicion, as he surmised that the truck might be avoiding him. Once Arwood stopped the vehicle, he became even more suspicious. During his initial encounter with the defendants he witnessed defendants Verduzco and Anguiano exhibiting signs of unusual nervousness and anxiety. He also saw that there was only one suitcase in the bed of the truck, despite the fact that there were four occupants in the vehicle on a trip that clearly was not local, but instead had originated from a city several states away. Arwood also observed during his initial encounter that the defendants' truck had a paper tag, and he mentioned this fact to the defendants in explaining why he initiated the traffic stop. Arwood's subsequent conversation with Anguiano concerning the ease with which such paper tags are illegally manufactured suggests that the tag added to Arwood's suspicion of criminal activity. In addition, Arwood noticed that there was a gap between the tailgate and bumper, which, based on his training and experience, he knew could be a sign of a false compartment, particularly in the bed area. Finally, Arwood learned during this initial encounter that although Anguiano was driving,

he could provide no license or identification whatsoever, which added to Arwood's suspicion of criminal activity.[46]

The court finds that by the time the initial encounter with the defendants concluded – at approximately 2 minutes and 37 seconds into the stop, and before Arwood returned to his patrol car, Arwood had sufficient, articulable facts to constitute reasonable suspicion to prolong the stop in order to investigate possible drug trafficking. The court bases this determination both on the facts already known to Arwood at the time he initiated a lawful traffic stop, and the facts he learned during his own initial encounter with the vehicle. As to the former, the court finds that Arwood's advance knowledge of certain facts was the product of a reliable tip from Kolbe.[47] Kolbe, a law enforcement officer trained in drug interdiction, provided an eyewitness account of suspicious behavior. In addition, the facts that he relayed to Arwood – *i.e.,* the make and model of the truck and the fact that it carried a temporary tag, when the truck likely would be in Arwood's jurisdiction and on what highway, the departure city, and the number of occupants – were easily and instantly corroborated. Thus, combining Kolbe's account of his own stop to Arwood with the facts

---

[46] The fact that Anguiano was driving well under the speed limit, and that the truck's temporary tag was partly concealed by a plastic cover that had been allowed to accumulate condensation, reasonably might have caused Arwood to infer that the occupants did not want to be stopped for a speeding violation, and also did not want the numbers on the tag to be perceived readily by law enforcement. Arwood also reasonably may have inferred from the fact that that the truck had been purchased just two weeks before that the occupants might be involved in drug trafficking because (as Kolbe testified) drug traffickers often use newly-purchased vehicles to transport contraband. And, indeed, Arwood actually may have drawn such inferences. However, the government elicited no testimony to this effect, so the court does not consider these facts in the totality of the circumstances relating to Arwood's initial encounter.

[47] The government does not explicitly contend that Kolbe was a reliable informant whose tip should be considered in the reasonable suspicion analysis; however, because the law relating to such tips clearly applies to this case, the court believes that it must reach this issue.

that Arwood gained during his initial encounter with the truck, the court concludes that, under the totality of the circumstances, reasonable suspicion to prolong the stop existed as early as approximately two and a half minutes into the stop. See e.g. United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999)(objectively reasonable suspicion of illegal activity is justified under circumstances such as no proof of ownership of vehicle, no proof of authority to operate the vehicle, and inconsistent statements about the destination); United States v. Simms, 385 F.3d 1347, 1354-355 (11th Cir. 2004)(finding reasonable suspicion based on nervous conduct, a prior history of drugs, and a questionable story about the defendant's travel plans); United States v. Holt, 777 F.3d 1234, 1257 (11th Cir. 2015)(affirming finding that police had reasonable suspicion sufficient to prolong stop to investigate drug or currency smuggling because driver was nervous, breathing heavily, and had shaky hands, and driver and passenger provided inconsistent statements about their recent travel); United States v. Hernandez, 418 F.3d 1206, 1211 (11th Cir. 2005)(finding continued detention justified by reasonable suspicion because driver provided an "implausible excuse for speeding," vehicle occupants provided differing stories about the trip's length and purpose, both detainees exhibited "abnormal nervousness," occupants exhibited a lack of knowledge about the trip's destination, and the vehicle was traveling between two main source cities for narcotics); and United States v. Thomas, 621 F. App'x 622, 623 (11th Cir. 2015)(finding, after Rodriguez, that the extension of a traffic stop to perform a canine sniff was supported by articulable suspicion because the passenger was breathing heavily even though she was only a passenger, and the passenger and driver gave conflicting stories about where the trip began). Although a stop's duration, independent

from other factors, is not the controlling factor in deciding whether a stop was impermissibly prolonged, the court simply cannot conclude that the nearly three minutes it took Arwood to acquire reasonable suspicion of criminal activity prolonged the stop beyond the time reasonably required to complete the mission of issuing a traffic warning or citation. See Ramos, 2017 WL 26905, *3 (holding that because the officer obtained all the information contributing to reasonable suspicion within 12 minutes of the beginning of the stop, during the course of conducting precisely the sort of inquiries recognized as ordinary and lawful in Rodriguez, it was "impossible to argue" that he prolonged the stop beyond the time reasonably required to complete the mission of issuing a warning or ticket).

Moreover, the record supports a conclusion that Arwood's reasonable suspicion only grew as the stop continued. See Heald, 165 F. Supp. 3d at 774 ("An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered.") After returning to his car, Arwood spoke with Kolbe again and, during that conversation, learned that the defendants had also suddenly "exited on" Kolbe. Arwood then spoke with Anguiano and Verduzco and learned the following: (1) that the truck had traveled almost continuously from Laredo, which Arwood knew from his training and experience was possibly an indication of drug trafficking; (2) that the defendants had no set plans for activities other than shopping once they arrived in Atlanta, although the trip might last as long as three days; (3) that when the defendants abruptly exited the interstate, they obtained only 20 dollars' worth of fuel, and did not fill the tank, which Arwood's training and experience led him to believe that the

exit had been a ruse to avoid his detection; and (4) that Anguiano and Verduzco gave inconsistent statements regarding the clothing that they packed for the trip.

Defendants urge the court to find that Arwood's call to Kolbe – which occurred after Arwood's initial encounter with the vehicle and before he called dispatch – as well as Kolbe's conversation with Howell upon Howell's arrival – unreasonably prolonged the traffic stop. However, the court need not reach whether these two conversations unconstitutionally prolonged the stop because they occurred after Arwood returned to the patrol car and had already acquired reasonable suspicion. Because Arwood had reasonable suspicion, he was permitted to conduct further inquiries related to the drug investigation without violating the Rodriguez standard. Moreover, as the stop continued and Arwood's suspicion grew, he was entitled to prolong the search further. Accordingly, the court finds no Fourth Amendment violation here.

> 4.      Did the search exceed the scope of the consent given?

Defendants argue that even if the consent to search given to Arwood by Anguiano and Verduzco was valid, the search nevertheless exceeded the scope of that consent. Defendants first contend that defendants Anguiano and Verduzco did not consent to exterior and interior canine searches. Defendants further argue that defendants did not consent to the disassembly and subsequent search of the vehicle at the automobile dealership.[48] The government responds that consent is not required for an exterior canine

---

[48] Though Anguiano generally states, without further explanation or citation to legal authority, that the "extensive and lengthy" search "exceeded the reasonable bounds of" consent (Doc. 97 at 22), defendants do not appear to argue that the initial interior search – conducted prior to the introduction of the canine – exceeded the scope of consent. The defendants' arguments regarding

search, and that there existed probable cause for the disassembly and search of the vehicle at the automobile dealership. As discussed in more detail below, the government does not address the alleged interior canine search.

The court has already determined that the consent to search given to Arwood by Anguiano and Verduzco was valid; therefore, it turns to the question of whether the search exceeded the scope of the consent. "The scope of a consensual search is determined by the terms of the actual consent given." United States v. Woods, 445 F.Supp.2d 1328, 1332 (M.D. Ala. 2006) (citing United States v. Martinez, 949 F.2d 1117, 1119 (11th Cir. 1992)). "However, when … "an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless. Rather it is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass.'" Id. (quoting United States v. Strickland, 902 F.2d 937, 941 (11th Cir. 1990)). "A search that forces open a sealed compartment that reasonably may contain the objects of the search remains within the bounds of a general consent to search … however, a search that destroys a vehicle, its parts, or its contents exceeds the scope of the consent provided." Woods at 1332 (internal citations omitted).

---

the scope of consent focuses primarily on whether the canine search and subsequent disassembly and search at the automobile dealership exceeded the scope of consent. Thus, the court addresses these specific arguments in a specific manner. To the extent that defendants intended to argue that the initial search exceeded the scope of consent, this argument is without merit. The record is clear that the defendants consented to a search of the interior of the vehicle by Arwood and, furthermore, never revoked that consent. Defendants offer no grounds on which the court could determine that the scope of that interior search exceeded the consent given.

a.    Exterior canine sniff

The record reflects that after Arwood received consent to search the vehicle from both Anguiano and Verduzco, he searched the vehicle himself, and then asked Howell to deploy the canine. The canine walked around the vehicle and conducted a free air sniff. Defendants argue that their consent did not extend to an exterior canine sniff.

However, "[t]here is no consent required for a well-trained narcotics detection dog to sniff the exterior of a vehicle incident to a valid stop.  An exterior sniff is not considered a search because, as the Supreme Court has stated, it 'does not expose noncontraband items that otherwise would remain hidden from public view.'" Woods at 1332 (quoting Illinois v. Caballes, 543 U.S. 405, 409 (2005)).  "[T]he possession of contraband 'compromises no legitimate privacy interest.' This is because the expectation 'that certain facts will not come to the attention of the authorities' is not the same as an interest in 'privacy that society is prepared to consider reasonable.'" Caballes at 408-409. The law is clear that consent is not a prerequisite for a warrantless exterior canine sniff; therefore, the court need not reach the question of whether the exterior canine sniff exceeded the scope of consent.

b.    Interior canine sniff

Defendants refer in their initial motions to suppress to an "interior canine search." For example, Verduzco alleges in his statement of facts that the canine made "several passes around the exterior of the truck without signaling or learning. Then, Howell, at the urging of Deputy Arwood, encourage[d] [the canine] to sniff at a particular portion of the truck's interior, near the back seat of the vehicle. According to Howell and Arwood, [the canine] alert[ed] on the spot they pointed out to the dog." (Doc. 96 at 5). In the argument

45

portion of his motion, Verduzco maintains that Arwood "exceed[ed] the scope of consent when he … then searched the … interior of the truck with the drug dog."  (Id. at 16). Verduzco contends that there was no consent for the "interior dog sniff" because "the dog remained in Officer Howell's police vehicle until after [t]he [d]efendant allegedly gave consent, and after Deputy Arwood had completed his unsuccessful search of the truck. It is not reasonable to conclude that the alleged consent … extended to a dog sniff of the interior … because there was no mention of the dog prior to the dog sniff and the presence of the dog was not known until the dog sniff was underway." (Doc. 96 at 18). Anguiano's motion contains the same facts and arguments. (Doc. 97 at 7, 22, 24). The government never responds to either defendants' argument on this point. It does not address in its collective response to all the motions to suppress whether defendants' consent reasonably extended to include such an interior sniff or, indeed, whether an interior canine sniff occurred at all. The government addresses only the exterior sniff and argues that consent is not required for such a search. (Doc. 116 at 3, 11-12). While both the defendants and the government could have clarified this issue not only at the evidentiary hearing, but also in their supplemental briefs, neither side elected to do so. The government did, however, offer as an exhibit the dash camera video of the stop. The court has painstakingly analyzed this video with the hope of gaining clarity, albeit with little assistance from the parties.

Unfortunately, due to the position of the dash camera and defendants' location in between the front of the patrol car and the back of the Toyota, the court has only a very partial view of the canine sniff. As previously noted, as best the court can tell, Howell brought Goose to the defendants' truck and then began leading the dog from the passenger

side of the truck to the front of the truck. It appears that Howell then brought Goose to the back of the truck. Goose jumped into the bed of the truck and then back out.  Howell led Goose back to the passenger side of the truck. At the 1:04:08 mark, the video shows that Arwood said to Howell: "Try to present this … uh … try to present that little crack right there … yeah, where he's going right there … up there behind the seat … ." It also appears from the video that Arwood pointed a flashlight in the direction of the open passenger side door, and, in his testimony at the suppression hearing, Arwood confirmed that he shined his flashlight into the back seat of the truck. The video then shows Goose standing on his hind legs, presumably with his front paws on the vehicle. However, the court cannot tell from the video whether the front paws – or any other portion of Goose's body, for that matter – were actually in the Toyota. Arwood testified that he asked Howell to present the area "where the rear wall [of the truck] and the floor meet. Because of the bolts that I saw the tool marking on, I thought the compartment could very well be in the floor. So I wasn't sure if it was the floor or wall, so if he presented the crack it would cover both." At the 01:04:28 mark, the video shows that the canine sat down on the grass beside the open passenger side door. The dog then stood up and exhibited signs of agitation.

It appears to the court that, in this case, the canine not only breached the threshold of the passenger side door, which was opened by Arwood, but put at least a portion of his body inside the Toyota. It also appears that the alert[49] occurred after the canine breached

---

[49] Defendants Diaz, Anguiano, and Verduzco argue in their supplemental briefs that the government failed to put on evidence that the canine alerted during the exterior sniff.  While it is true that the government did not call the canine's handler to testify at the evidentiary hearing, the record does not support defendant's argument that the government failed to introduce evidence of

the threshold. However, given that there is no decisive evidence of record that would permit the court to be absolutely certain about this conclusion – and the parties have not made their positions, or the facts upon which those positions are based, abundantly clear – the court is not in a position to determine definitively that an interior search occurred or that the canine alert occurred as a result of the interior search. Out of an abundance of caution, however, the court assumes for the purpose of this recommendation that the canine's actions constituted an interior search and analyzes the search accordingly.

Unlike an exterior canine sniff, an interior canine sniff or search "is capable of revealing information beyond the location of contraband materials" and is governed by the Fourth Amendment. Woods, 445 F.Supp.2d at 1332. If a dog instinctively migrates into the interior of a vehicle, the Fourth Amendment is not violated. See U.S. v. Mostowicz, 471 Fed. Appx. 887 (11th Cir. 2012) (collecting cases and holding that dog's entry into defendant's vehicle, which was not prompted by encouragement or facilitation from the officers, did not constitute a Fourth Amendment violation). There is also no constitutional violation if there is consent for an interior canine search. See Woods at 1332-1333 (holding that defendant's general consent extended to an interior canine search because, while the dog arrived after consent was given, defendant was "fully aware for some time of the dog's presence and its purpose" and did not "specifically limit the area" the officers could search," and because it was apparent from videotape that the defendant "must have known the officers were looking for drugs … and that the consent would include a dog sniff" in

---

a positive alert. Arwood offered eyewitness testimony as to the dog's alert, which this court finds sufficient. Moreover, the video evidence summarized above supports Arwood's testimony.

those places "where narcotics would be reasonably hidden.")(internal citations and quotation marks omitted); United States v. Campbell, 2011 WL 6097998 (D. Me. Dec. 6, 2011)(officer's placement of canine in vehicle did not violate Fourth Amendment because defendant provided valid consent to admitting canine into interior of vehicle); United States v. Boston, 2005 WL 354037, fn. 4 (W.D. Tex. Jan. 25, 2005)(noting that a prudent officer would likely refrain from placing a drug sniffing canine inside a car *unless* he or she had other probable cause for the search, a warrant, or consent). Here, the undisputed evidence of record is that both defendants Anguiano and Verduzco consented to a search of the vehicle. Their general statements of consent contained no limitations. While their consents were given prior to Howell's removing the canine from the car, the court cannot conclude that their consents did not extend to the canine sniff.

The video shows that the defendants were clearly within hearing range when Arwood directed Howell to "go get Goose."  The video also shows the defendants standing by as Howell brought the dog from his patrol car to the Toyota. The defendants watched the dog as Howell brought it to sit beside the Toyota. They continued to watch silently as Howell conducted the exterior sniff. They were also within hearing range when Arwood directed Howell to present a particular area in the open vehicle. The defendants remained silent when that occurred, and continued to remain silent while Howell initiated what appears to be an interior sniff or search. Defendants could have revoked their consent at any time during this series of events; however, they did not.  Furthermore, Arwood testified that it was his understanding throughout the proceeding that he had consent for the search and that consent was never revoked.  Accordingly, the court concludes that, to the extent

49

that an interior canine search or sniff was conducted, defendants' general statement of consent extended to that search. Therefore, there was no constitutional violation.

Before proceeding to the question of whether the dealership search exceeded the scope of consent, the court must address defendants' arguments regarding the propriety of the canine search itself. In their supplemental briefs, defendants Diaz, Anguiano, and Verduzco argue that the search was not reliable because it was not conducted using standard operating procedures. Although defendants do not make clear the "procedures" to which Arwood and/or Howell should have conformed, the court assumes that, in light of defendants' statements in their motions to suppress, defendants may intend to argue that Goose was "cued" or "encouraged" in a manner that violated standard operating procedures. Defendants also contest the validity and sufficiency of the canine's training and handling.

Here, the relevant inquiry is whether a canine alert is reliable, as a reliable canine alert provides probable cause to search. "A dog sniff must be sufficiently reliable in order to establish probable cause, and this reliability is generally present if the dog is 'well-trained.'" United States v. Nelson, 309 Fed. Appx. 373, 375 (11th Cir. 2009) (internal citations omitted). It has long been the law of this circuit that "[e]vidence of a dog's training is sufficient proof of reliability." Id. See also United States v. Trejo, 551 Fed. Appx. 565, 568-69 (11th Cir. 2014) ("Before finding probable cause, we generally require that a dog's alert be reliable, and have recognized that 'training of a dog alone is sufficient proof of reliability.'")(citing United States v. Sentovich, 677 F.2d 834, 838 n. 8 (11th Cir. 1982)). In Florida v. Harris, 133 S.Ct. 1050 (2013), the Supreme Court clarified the law on

reliability of canine alerts. While it did "not unsettle [the Eleventh Circuit's jurisprudence that an alert from a canine trained in narcotics detection can establish probable cause," the decision recognizes, consistently with Eleventh Circuit case law, that a court may "presume" that a dog's alert provides probable cause to search under certain circumstances, such as when the canine is certified by a "bona fide" organization or "has recently and successfully completed a training program." Trejo, 551 Fed. Appx. at 570 (quoting Harris at 1057). The Supreme Court added, however, that if the defendant "challenges [the government's] case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence." Harris at 1058. The government has offered evidence that the canine and his handler were trained and certified by the Alabama Canine Law Enforcement Officer's Training Center and that, at the time of the search, the relevant certifications were active. The government has also offered evidence that the canine's training was narcotics-specific. Defendants have adduced no evidence tending to show that the canine's training or certifying organization was not "bona fide" or that the canine did not successfully complete the program; Goose's trainer testified that Goose and his handler achieved a passing grade during testing that was sufficient for certification. Thus, the court proceeds with the presumption that the canine's positive alert was reliable.

While defendants appear to argue that because Arwood or Howell "cued" or "encouraged" the canine to sniff at a particular portion of the interior of the vehicle, and that this action fell short of "standard operating procedures" for canine sniffs, defendants offer no evidence of any such "standard operating procedures" and fail to describe what may have constituted "cuing" or "encouragement" on the officers' part. To the extent that

the defendants are referring to Officer Arwood's shining a flashlight in the direction of the passenger side door toward the crack where the rear wall of the truck and the floor met, as reflected in the video, the court finds no impermissible cuing. The government's expert, Ricky Farley, testified that handlers are taught to present "natural cracks and openings" to a canine to sniff, and that some handlers use pointers and laser finders for the dog to follow. Defendants offered no evidence or legal authority to dispute the fact that using a light to direct a dog's attention to a certain area is a commonly accepted practice. Faced with the absence of any evidence to rebut the government's position, the court finds that the positive alert was sufficiently reliable. See Lopez, 2017 WL 373454, *7 (rejecting argument that the canine search was improper, as the government introduced evidence of the canine's training and defendant cited no facts that called into question the canine's alert, the sufficiency of the training, or the veracity of the certification).

      c.     Disassembly and subsequent search at automobile dealership

Defendants also argue that the disassembly and subsequent search of the vehicle after it was taken to a local automobile dealership exceeded the scope of consent given by defendants Anguiano and Verduzco. The government responds that it had probable cause for this portion of the search. Again, whether the alert occurred during an exterior or interior canine search, the record reflects that the dealership disassembly and search did not take place until after the canine positively alerted to the presence of narcotic odor. A positive canine alert provides probable cause to search. See e.g. United States v. Jackson, 548 F.Supp.2d 1314 (M.D. Fla. 2008) (after canine alerted in vehicle, officers had reason to believe contraband was located in a hidden compartment in vehicle, making next-day

disassembly and search constitutionally permissible); <u>United States v. Trejo</u>, 551 Fed.Appx. 565, 568 (11th Cir. Mar. 24, 2014) ("This Court has long recognized that probable cause arises when a drug-trained canine alerts to drugs.") (citations and internal quotation marks omitted); <u>United States v. Nelson</u>, 309 Fed. Appx. 373, 375 (11th Cir. Feb. 4, 2009) ("In the case of dog sniffs, probable cause arises when a drug-trained canine alerts to drugs.") (citations and internal quotation marks omitted); <u>Lopez</u>, 2017 WL 373454, *6-7 (because the canine's alert furnished probable cause, defendants' lack of consent was of no consequence to the constitutional inquiry). Because there was probable cause to search for drugs, the court need not determine whether the dealership disassembly and search exceeded the scope of defendant's consent.[50]

Moreover, "under the automobile exception to the requirement for search warrant, if a vehicle is readily mobile and there is probable cause to believe that it contains contraband, officers may search it without a warrant." <u>U.S. v. Berkley</u>, 2013 WL 6858920, *10 (N.D. Ga. Dec. 30, 2013) (citing <u>Pennsylvania v. Labron</u>, 518 U.S. 938, 940 (1996)). In this case, the defendants' Toyota was obviously mobile and the canine's alert provided probable cause. "Moreover, the probable cause gave [the officers] the right to search 'every part of the vehicle and its contents that may conceal the object of the search.'" <u>Id.</u> (quoting

---

[50] Defendant Quach argues in her motion to suppress that the "search incident to arrest" and "inventory" exceptions are not applicable in this case. (Doc. 86). The court does not reach the question of whether such exceptions have any effect in this case, as the government relies on neither theory.

<u>United States v. Ross</u>, 456 U.S. 798, 825 (1982)). The court finds no Fourth Amendment violation here.[51]

**Conclusion**

Accordingly, for the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that defendants' motions to suppress (Docs. 86, 93, 96, 97) be DENIED.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before March 14, 2016. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. <u>Nettles v. Wainwright</u>, 677 F.2d 404 (5th Cir.

---

[51] Defendants Verduzco and Anguiano argue in their motions to suppress that Arwood did not have "voluntary consent" for the search at the dealership, and contend that any consent given for that search was the product of duress. (Doc. 96 at 16; Doc. 97 at 22-23). Defendants concede that Anguiano agreed to take the vehicle to the dealership, but argue that he did so only because Arwood told him that he could either drive the truck to the dealership or Arwood would have it towed to the dealership. (Doc. 97 at 23). The court does not reach the question of whether, in light of Arwood's statement, any subsequent consent to search at the dealership was voluntary, as there existed probable cause for the search, making consent unnecessary.

1982).  <u>See</u> <u>Stein v. Reynolds Securities, Inc.</u>, 667 F.2d 33 (11th Cir. 1982).  <u>See also</u> <u>Bonner v. City of Prichard</u>, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, on this the 24th day of February, 2017.

/s/ Susan Russ Walker
Susan Russ Walker
Chief United States Magistrate Judge