IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

UNITED STATES OF AMERICA  )
            )
v.           )   3:16cr342-WKW-SRW
            )
ROBERTO ANGUIANO, III  )
MARIO VERDUZCO    )
ANGELA QUACH     )
DEEDRE DIAZ      )

**SUPPLEMENT TO REPORT AND RECOMMENDATION (DOC. 162)**

This matter is before the court on defendants' objections to the undersigned's Report and Recommendation (Docs. 171, 172, 175, and 181).

**Discussion**

1.  Application of United States v. Peters, 10 F.3d 1517 (10th Cir. 1993).

In their objections to the Report and Recommendation, defendants Anguiano, Verduzco, and Diaz raise for the first time the applicability of United States v. Peters, 10 F.3d 1517 (10th Cir. 1993) to this case.[1] Defendants argue that Deputy Arwood's continuation of the traffic stop was based solely on information he received from Deputy Kolbe, and they maintain that Deputy Kolbe had already dispelled any suspicions he had by the time he called Arwood. Citing Peters, defendants argue that because Arwood himself developed no independent, articulable reasonable suspicion, and instead relied on Kolbe's already refuted suspicions, the stop's continuation was unconstitutional.

---

[1] See Doc. 172 at 10; Doc. 175 at 10; Doc. 181 at 10.

Peters is not binding on this court; however, even if it were, it is factually distinguishable from the instant case.  In United States v. Padilla-Esparza, 798 F.3d 993, 1000-01 (10th Cir. 2015), the Tenth Circuit, after noting that "successive investigatory stops are not per se prohibited," summarized the Peters holding.

In *Peters,* two defendants were convicted of unlawful possession of identification documents and false representation of citizenship based on evidence discovered during a second investigatory stop. *Id.* at 1518, 1520. A police officer first stopped the defendants in Flagstaff, Arizona for weaving. *Id.* at 1519. The officer obtained driver's licenses from both, who said they were moving from California to Dallas. *Id.* The officer asked where they were originally from, and the men responded they were Nigerian. *Id.* The officer observed they were "extremely nervous." *Id.* A computer check of their licenses, however, revealed no irregularities. *Id.* The officer decided to investigate whether the defendants were nervous because they were transporting illegal drugs. *Id.* He requested a drug-detection dog, but none was available. *Id.* The driver consented to a manual search of the truck, which revealed no evidence of drugs or other illegal activity. *Id.* The officer issued the driver a warning for weaving and let the defendants go. *Id.*

After the encounter, however, the officer was not satisfied with the search because of the defendants' nervousness and his failure to obtain a drug-detection dog. *Id.* The matter was referred to an agent at the border patrol station in Albuquerque, New Mexico. *Id.* at 1520. The agent intercepted the defendants' truck and pulled them over based on what he perceived to be "nervous behavior." *Id.* He also requested back-up and a drug-detection dog, which both promptly arrived. *Id.* The agent obtained permission to search one of the defendants' wallets and found a counterfeit social security card. *Id.* The agent and back-up officers also obtained permission to search the truck, where they found additional false identification documents. *Id.*

The defendants moved to suppress the evidence, arguing the agent lacked reasonable suspicion for the second stop. *Id.* at 1518–19. The district court denied the motion. *Id.* at 1518. We reversed, concluding that the second stop was not valid because the DEA agent lacked "an objective and particularized basis for his suspicions that was reasonable and sufficient to justify the second intrusion." *Id.* at 1521. We explained that "[t]he results of the initial stop in Flagstaff, without any new information, dispelled any reasonable suspicion of illegal activity as a matter of law." *Id.*

Id. at 1000-01. While the facts of the Peters case are similar to the case at bar, there are key distinctions which render it unpersuasive here.

First, unlike in Peters, the court is unwilling to conclude that Deputy Kolbe's initial stop entirely dispelled any reasonable suspicion. While it is true that Deputy Kolbe conducted consensual manual and canine-led searches of the defendants' vehicle, and each search failed to result in the discovery of the concealed drugs, Kolbe testified that during the interior search, he observed rust underneath the rear bench passenger seat frame that holds the seat down, despite the fact that the truck was relatively new and none of the other seats exhibited significant rust. Kolbe suspected that the seat "had been in and out of that truck on numerous occasions, meaning that it had been sitting outside maybe for an extended amount of time where moisture in the air had started to build up that rust on the surface of it." Kolbe believed that there was no reason other than drug trafficking for the seat to have been removed from the truck, since there was no mechanical part underneath the back seat that would have to be serviced by taking out the seat. He suspected that there was either a hidden compartment or a natural void in that area that was being used to hide contraband. Kolbe also noted "evident tooling" on the bolts that mounted the seat to the floorboard – that is, scratches, abrasions, or wearing indicative of constant removal, which has caused the factory paint to start to come off, exposing the bare metal. However, Kolbe was unable to remove the back seat because he did not have his tool kit, which was in his county-issued vehicle in the shop for service.   Kolbe ultimately concluded that, even though he still harbored suspicions, he had to let the truck proceed.

More importantly, Deputy Arwood did not rely *solely* on Deputy Kolbe's suspicions. He knew at least the following from his conversation with Kolbe: (1) there was a Toyota Tundra traveling on the interstate from Laredo, Texas – which, based on Arwood's training and experience in law enforcement and drug interdiction, he knew to be a "source" city; (2) the vehicle was possibly traveling to Atlanta, Georgia, which Arwood also knew to be a "hub" city; (3) when questioned by a deputy sheriff during a traffic stop, the men in the truck had provided inconsistent statements regarding their travel plans – *i.e.,* one defendant said they were traveling to Atlanta and the other defendant said they were traveling to Montgomery; (4) one of the occupants of the vehicle had a prior drug arrest; and (5) during the course of an unsuccessful search for drugs in the truck, Kolbe had seen rust build-up on the back seat, which Arwood believed indicated that the back seat might have been taken out of the vehicle.

However, Arwood also made his own observations. As the Recommendation noted, the record reflects that, subsequent to his conversation with Kolbe, Arwood saw the truck traveling down the interstate and confirmed that the direction of travel was toward Atlanta, despite the fact that one of the occupants had told Kolbe that the travelers' destination was Montgomery. Arwood testified that the truck suddenly "exited on" him, which added to his suspicion, as he surmised that the truck might be avoiding him. Once Arwood stopped the vehicle, he became even more suspicious. During his initial encounter with the defendants he witnessed defendants Verduzco and Anguiano exhibiting signs of unusual nervousness and anxiety. He also saw that there was only one suitcase in the bed of the truck, despite the fact that there were four occupants in the vehicle on a trip that clearly

was not local, but instead had originated from a city several states away. Arwood also observed during his initial encounter that the defendants' truck had a paper tag, and he mentioned this fact to the defendants in explaining why he initiated the traffic stop. Arwood's subsequent conversation with Anguiano concerning the ease with which such paper tags are illegally manufactured suggests that the tag added to Arwood's suspicion of criminal activity. In addition, Arwood noticed that there was a gap between the tailgate and bumper, which, based on his training and experience, he knew could be a sign of a false compartment, particularly in the bed area. Finally, Arwood learned during this initial encounter that although Anguiano was driving, he could provide no license or identification whatsoever, which also added to Arwood's suspicion of criminal activity.

In United States v. Whitehouse, 922 F. Supp. 1 (E.D. Mich. 1996), the court was presented with an argument similar to that made in defendants' objections. In Whitehouse, the defendant argued that Peters provided authority for holding that a successive investigative stop was unconstitutional. The court rejected this argument. It determined that because the officers who made the secondary stop "did not rely *solely* on information provided by" the authorities who made the first stop and indeed, discovered "*additional* information" which, "when coupled with the information provided by [the authorities who made the first stop]," added to their suspicion, the officers had independent, reasonable suspicion and, thus, the secondary stop was constitutional.  Id. at *7 (emphasis in original). The court further reasoned:

> Moreover, in this modern era of transcontinental drug trafficking, it would be wholly unreasonable for this Court to hold that officers in one city cannot consider and act upon reliable information provided by officers in

another city, nor even compare this information with their own observations when making a decision whether to stop suspected drug traffickers. Where law enforcement officials in another city have previously interviewed a suspect, it would be absurd to prohibit any subsequent reliance on the information gleaned in such an interview, particularly when one considers that officers are permitted to rely upon information from informants in making search and seizure determinations, even if the informants are themselves suspected of criminal activities. *Illinois v. Gates,* 462 U.S. 213, 233–35, 103 S.Ct. 2317, 2329–30, 76 L.Ed.2d 527 (1983). Indeed, as *Gates* itself shows, officers may even rely upon information provided by anonymous sources in making stops, so long as the reliability of the information has somehow been established. *Gates,* 462 U.S. at 243–46, 103 S.Ct. at 2335–36. Thus, to preclude the Detroit agents in this case from considering and acting upon information received from Chicago-based agents who had actually spoken with Defendant and her travelling companion would unnecessarily encumber collaborative law enforcement operations without any conceivable constitutional justification.

Id. at 7.  This court is persuaded by the Whitehouse court's analysis, and finds similarly that Peters is inapplicable to the case at bar, as Deputy Arwood did not rely *solely* on the information he received from Deputy Kolbe.

    2.   Canine search.

Defendants Anguiano, Verduzco, and Diaz also contend for the first time in their objections that Deputy Arwood – as opposed to the canine's handler, Officer Howell – directed the canine to search a particular area inside the vehicle, and that this direction amounted to interference. Defendants Anguiano and Verduzco state in their objections that Arwood's "directing the dog to an area to search was an interference in the search and not proper." (Doc. 172 at 6; Doc. 175 at 6). Similarly, defendant Diaz maintains in her objection that she is opposed to any finding that "with regards [sic] to the laser pointer[2] or

---

[2] There was no testimony that a laser pointer was used at any time during the stop, and the court made no such finding. The court assumes that Diaz is referring to Arwood's flashlight.

direction by Arwood, who was not Goose's handler[,] into the cab of the truck was reasonable and/or proper." (Doc. 181 at 6).

The court notes that prior to filing their objections, Anguiano and Verduzco argued that Officer Howell – not Deputy Arwood – encouraged the canine to sniff a particular portion of the interior. In the facts sections of their substantively identical motions to suppress, these defendants state: "Then, *Howell, at the urging of Deputy Arwood, encourages Goose to sniff at a particular portion of the truck's interior*, near the back seat of the vehicle.  According to Howell and Arwood, Goose alerts on the spot they pointed out to the dog."  (Doc. 96 at 5; Doc. 97 at 7) (emphasis added). Defendant Verduzco also argued previously that "Goose was encouraged *by his handler, Officer Howell*[,] to enter the vehicle, and was allowed to enter the interior of the truck by Howell." (Doc. 96 at 7) (emphasis added). It is only now – after two rounds of briefing, two full days of presenting evidence and argument, and the entry of a Report and Recommendation – that defendants explicitly argue that Arwood, not Howell, directed the canine to search the interior.

The record does not support a conclusion that Arwood directed the canine to sniff behind the back seat of the vehicle, nor did the court make any such finding. As the Recommendation explains, the video shows that Arwood said the following to Howell: "Try to present this … uh … try to present that little crack right there … yeah, where he's going right there … up there behind the seat … ." It appears from the video that Arwood then pointed a flashlight in the direction of the open passenger side door. Additionally, at the evidentiary hearing, Arwood testified that he asked Howell to present the area "where the rear wall [of the truck] and the floor meet. Because of the bolts that I saw the tool

marking on, I thought the compartment could very well be in the floor. So I wasn't sure if it was the floor or wall, so if he presented the crack it would cover both." Given the facts before it, the court could not – and did not – conclude that Arwood himself directed the canine to search any particular part of the vehicle. There is simply no clear evidence that Arwood shined his flashlight on a specific area inside the truck in an attempt to direct the canine to sniff that area. At best, the evidence supports the conclusion that Arwood asked Officer Howell to present to the canine a certain part of the vehicle and used the flashlight as a tool or indicator in making this request.

The court discussed the propriety of Arwood's use of the flashlight in the original Recommendation only because defendants made the basis for their argument that the canine sniff violated "standard operating procedures" wholly unclear. The undersigned was forced to guess as to the "procedures" in question and, given defendants' references – without any facts whatsoever – to "cuing" and "encouragement," felt compelled to consider whether the defendants were, indeed, referring to Arwood's shining a flashlight into the vehicle. The court determined in the Recommendation that "to the extent that the defendants [were] referring to Officer Arwood's shining a flashlight in the direction of the passenger side door toward the crack where the rear wall of the truck and the floor met, as reflected in the video," there was no impermissible cuing. This was because government's expert, Ricky Farley, testified that handlers are taught to present "natural cracks and openings" to a canine to sniff, and that some handlers use pointers and laser finders for the dog to follow – *and* because defendants offered no evidence or legal authority to dispute the fact that using a light to direct a dog's attention to a certain area is a commonly accepted

practice. Even if the defendants had offered testimony or evidence that Arwood himself used the flashlight to direct the dog to sniff a certain area – as opposed to using the flashlight in connection with his request to Officer Howell to present that area – defendants still have not offered any evidence or legal authority that Arwood's alleged action constituted any sort of violation. Thus, the court reaffirms that, based on the evidence and authority presented, it finds no violation.

      3.    <u>Other matters.</u>

Defendants Anguiano, Verduzco, and Diaz take issue with footnote 33 of the Report and Recommendation. In that footnote, the undersigned noted that "[t]hough the government did not reference this statute … under Alabama Code § 32-6-49.3(21)(b), "improper or erratic traffic lane changes" also constitute a traffic violation. Defendants' objection is well-taken. However, this objection does not affect the outcome of the instant case, as the court neither found that this statute applied nor incorporated it into its analysis of whether there existed probable cause for the subject stop.

Defendants Anguiano, Verduzco, and Diaz also dispute "the Magistrate[] [Judge's] finding of fact and legal conclusion that the stop in this case was not in violation of the Fourth Amendment on the basis of the 'collective knowledge' doctrine." However, the Recommendation made no such finding; it analyzed the facts of this case under the informant or "tipster" theory. <u>See</u> Doc. 162 at n. 47. While some cases cited by the undersigned in explaining the application of the tipster theory to this case also reference

the collective knowledge doctrine, the court did not determine that the collective knowledge doctrine applies to the instant matter. It simply did not reach this question.[3]

Accordingly, for the foregoing reasons, as well as for the reasons contained in the original Report and Recommendation (Doc. 162), it is the RECOMMENDATION of the Magistrate Judge that defendants' motions to suppress (Docs. 86, 93, 96, 97) be DENIED.

It is further

ORDERED that the parties are DIRECTED to file any objections to the instant Supplement to Report and Recommendation on or before March 29, 2017. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  Nettles v. Wainwright, 677 F.2d 404 (5th Cir. 1982).  See Stein v. Reynolds Securities, Inc., 667 F.2d 33 (11th Cir. 1982).  See also Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding

---

[3] On page 31, the recommendation cites United States v. Gonzales, 2007 WL 1175870, *4-5 (E.D. Mo. April 20, 2007).  The correct citation is 2007 WL 1174870.

precedent all of the decisions of the former Fifth Circuit handed down prior to the close of

business on September 30, 1981.

DONE, on this the 15th day of March, 2016.

/s/ Susan Russ Walker
Susan Russ Walker
Chief United States Magistrate Judge