IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.  3:16-CR-342-WKW |
| | ) | [WO] |
| ROBERTO ANGUIANO, III, | ) | |
| MARIO VERDUZCO, ANGELA | ) | |
| QUACH, and DEEDRE DIAZ | ) | |

## **MEMORANDUM OPINION**

On July 7, 2016, Defendant Roberto Anguiano, III, swerved over the fog line while changing lanes on an interstate highway.  He was pulled over, his truck was searched, and drugs were found inside.  He and his three passengers—Defendants Mario Verduzco, Angela Quach, and Deedre Diaz—were arrested.  Defendants moved to suppress the evidence obtained at the stop, claiming it was acquired in violation of the Fourth Amendment.  The Government filed a response in opposition before the magistrate judge held a two-day evidentiary hearing on the motions.  Defendants and the Government then fired off a round of supplemental briefing, leading the magistrate judge to enter a Recommendation favoring denial of the motions.  Four objections followed, then a supplemental Recommendation, and then two more objections.  Suffice it to say that the court has the benefit of a fully briefed motion.

In a previous order (Doc. # 196), the Recommendation was adopted.  This opinion supports that adoption.

## I.  BACKGROUND

It would be difficult to improve on the magistrate judge's detailed statement of the facts.  (*See* Doc. # 162 at 1–23.)  Instead, the court will summarize the facts relevant to today's decision while referring to the Recommendation as a more complete description of the events leading up to Defendants' arrests.

Alabama county sheriffs' officers stopped Defendants twice on July 7, first on I-65 North in Baldwin County and second on I-85 North in Chambers County.[1] Both traffic stops are relevant to this decision.

## A.    The First Stop: Baldwin County

On the morning of July 7, 2016, Deputy Jason Kolbe with the Baldwin County Sheriff's Office was on traffic patrol in Baldwin County, Alabama.  Kolbe, a trained canine handler and drug interdiction specialist, noticed a Toyota Tundra traveling northbound on I-65.  Condensation on a plastic cover had partially obscured the

---

[1] Baldwin County is in southwest Alabama, one of the state's two coastal counties. Chambers County is on the Georgia border in east-central Alabama, roughly three hours' drive from Baldwin County.  Parts of Chambers County and I-85 are in the eastern time zone, even though the Alabama–Georgia border is generally the boundary between the central and eastern time zones.  The first stop occurred at mile marker 35 on I-65 North; the second stop occurred at mile marker 78 on I-85 North.  According to Google Maps, these two points are 210 miles apart. *Google Maps*, http://maps.google.com.

truck's paper license tag, so Kolbe turned on his lights around 9:00 or 10:00 a.m.[2] to pull the truck over for a "no-plainly-visible-tag" violation under Ala. Code § 32-6-51. The Toyota traveled another half mile north before taking the next exit and stopping in the parking lot of a gas station.

Kolbe approached the parked pickup, finding Verduzco in the driver's seat and the other three Defendants riding with him. Kolbe spoke with Verduzco and Anguiano and began to develop a hunch that they were smuggling illegal drugs. Kolbe identified several causes for his suspicion: Defendants continued at least a half mile to a gas station rather than pulling over on the side of the interstate; the truck was newly registered; there was a small gap between the tailgate and bumper, which could be a sign of a false truck bed; Defendants were traveling from Laredo, Texas, a known source area for narcotics; Defendants had driven through the night to reach Baldwin County; Verduzco and Anguiano offered conflicting stories, with one claiming their destination was a family reunion in Montgomery and the other saying it was a shopping trip to Atlanta; and the four occupants carried only one suitcase with them, despite their claim that they planned to stay several days in either Montgomery or Atlanta. On Kolbe's request, Verduzco and Anguiano consented to a search of the truck.

---

[2] Kolbe initially claimed that he stopped the Toyota at 9:00, but later allowed that it was likely closer to 10:00. This uncertainty may reflect the persistent confusion in both police officers' testimony between the eastern and central time zones.

Kolbe spent between forty minutes and two hours searching the Tundra.[3]  He started on the truck's interior, where he observed rust underneath the rear bench passenger seat frame and tooling marks on the bolts securing the frame to the floorboard.  To Kolbe, this indicated that the seat had been removed "on numerous occasions."  (Doc. # 190 at 46.)  Because removing the seat was not necessary to service any mechanical parts, he suspected that a secret compartment in that area was being used to transport contraband.  Kolbe felt around for "depth discrepancy," which would be indicative of a hidden void, but found nothing.  (Doc. # 190 at 49.) He looked for Bondo, weld marks, and overspray, any of which would confirm his trafficking hunch.  But again he found nothing, and did not have the tools on hand to remove the seat.  So Kolbe moved on, searching the single piece of luggage, feeling along the truck bed, and crawling underneath the truck to inspect its undercarriage.  Still, nothing turned up.  Kolbe next ran an open-air sniff in a reverse search pattern with his drug dog, passing the canine four times along the truck's

---

[3] At the suppression hearing, Kolbe made inconsistent statements as to the timing of his traffic stop.  He initially claimed that he stopped the truck at 9:00 and detained Defendants for roughly twenty minutes.  When reminded on cross-examination that he made an 11:40 a.m. phone call two minutes after releasing Defendants, Kolbe ventured that he may have stopped the truck at 10:00.  He still insisted, however, that the stop did not last the entire hour and forty minutes between 10:00 and the post-release phone call—a discrepancy that could be explained by the confusion between eastern and central time.  Moreover, because the second stop took place around 1:30 p.m., and Defendants likely did not travel the 210 miles between the stops in a mere hour and fifty minutes, the court concludes that the phone call's 11:40 a.m. timestamp refers to eastern time.

Kolbe ultimately testified that he performed a full and thorough search, the duration of which was not limited by any time constraints or other pressures.  Because the court is satisfied that the search was exhaustive and unrushed, the exact length of the stop is irrelevant.

tailgate and twice along the front and each side.  The dog never alerted, leading Kolbe to conclude that he had to let Defendants go.  Having received a warning for the traffic violation, Defendants continued north on I-65.  Kolbe made no written report of the stop details.

Even after his extensive search, Kolbe still suspected that Defendants were trafficking drugs.  As he later testified, "I was highly suspicious, but I had to let them go."  (Doc. # 190 at 75.)  Two minutes after the truck drove off, Kolbe contacted[4] Deputy Rodney Arwood with the Chambers County Sheriff's Office, another interdiction specialist whom Kolbe had met while in training.  Kolbe told Arwood about the traffic stop and informed Arwood that Defendants could be heading his way.

Defendants' strongest objection highlights the communication between Kolbe and Arwood, so it is important to clarify precisely what was said.  Kolbe testified that he told Arwood "exactly what [Defendants] told me on the side of the road, from what the driver told me, the passenger, and [their] behaviors.  And then I also told him that I had searched that vehicle and where I had searched."  (Doc. # 190 at 54.)  More specifically, Kolbe told Arwood about the paper license tag, the gap between the truck's tailgate and bumper, the conflicting stories regarding Defendants'

---

[4] Kolbe initially claimed to have called Arwood, but Arwood testified that he received a text from Kolbe, not a call, that led him to call Kolbe back.

destination, that Defendants drove through the night, that Defendants were exceedingly nervous during the traffic stop, and that he found rust and tool marks under the passenger bench. Kolbe is "not 100 percent certain" that he told Arwood that only one suitcase was in the truck, but believes he did. (Doc. # 190 at 138.) With this in mind, Arwood promised to keep an eye out for the Toyota.

**B.     The Second Stop: Chambers County**

Sure enough, around 1:30 p.m. Arwood saw the Tundra motoring north toward Atlanta on I-85 North. Estimating that the truck was traveling well under the speed limit—roughly 60 m.p.h. in a 70 zone—Arwood pulled out of the interstate median and began following the Tundra. As Arwood's marked police car approached, the truck abruptly took the next exit. Arwood could not get over in time to make the exit, so he called a local law enforcement officer and trained dog handler, Lawrence Howell, to find Defendants and keep an eye on them. Meanwhile, Arwood pulled over and waited for Defendants on the shoulder of the road. During this detour, Anguiano spent $20 on gas at a service station, but did not fill the truck's tank.

Before Howell could locate the Toyota, Arwood saw it back on the interstate. Traveling in the left-hand lane, it passed Arwood's parked car, then made a signaled change into the right-hand lane. In the process of moving over, the truck's right tires crossed the fog line—the solid white line on the far right side of the road. Arwood

turned on his lights and initiated a traffic stop for improper lane usage under Ala. Code § 32-5A-88(1).

The vehicles pulled over to the interstate shoulder and Arwood called in to the dispatcher to give his location and the Toyota's license plate number.  Arwood approached the Tundra, identified himself, and asked the driver, Anguiano, for his license and registration.  Anguiano, who had no driver's license or other identification, instead gave Arwood either a bill of sale or proof of insurance.[5] Verduzco, a passenger on this stop, also offered Arwood a photocopy of his Texas driver's license.  Arwood took the documents and returned to his patrol car at the 02:37 mark.[6]

Arwood sat in his car until minute 03:42, when Kolbe called him on his cell phone.  Kolbe asked Arwood if he had "found them," Arwood replied that he had, and the two talked for a few minutes about where contraband might be hidden in the truck.  Arwood hung up and tried to call dispatch with Defendants' personal information at the 06:00 mark.[7]  Dispatch did not answer, so Arwood tried again at

---

[5] Arwood's testimony was unclear on this point.

[6] The dashcam footage introduced by the Government shows only the amount of time that has elapsed since the video began recording.  This opinion refers to the recording's timestamp in the (minutes):(seconds) format.

[7] Arwood initially claimed that he called dispatch immediately upon returning to his patrol car, but the audio recording of the traffic stop reveals that the call took place only after Arwood got off the phone with Kolbe.

07:34, this time successfully, and read Defendants' information to the dispatcher. Arwood then sat back and continued to wait for Howell to arrive with his drug dog.

After a couple of minutes, around nine minutes into the stop, Howell arrived and joined Arwood in his patrol car. Arwood began telling Howell about Kolbe's earlier stop and his trafficking hunch before he was interrupted by dispatch at the 10:02 mark with the requested information on the Tundra's tag. Arwood and Howell resumed talking for the next four minutes or so, until they approached the Tundra at the 14:51 mark. Arwood then asked Anguiano to exit the truck; Anguiano complied, and Arwood took him to the patrol car.

Owing to a language barrier, Arwood had Anguiano write down his name, date of birth, and Social Security number. At minute 17:56, Arwood called this information in to dispatch, remaining on the line until the 21:00 mark. Arwood still had not seen a photo ID for Anguiano, so he then asked Anguiano for his name, address, and date of birth to cross-reference the tag information he had already received from dispatch. Anguiano then began making small talk, and Arwood fielded his questions before asking at the 23:16 mark who was the owner of the truck. Anguiano responded that it belonged to Verduzco. After a few more minutes of conversation, at minute 28:54, Arwood asked for and received Anguiano's consent to search the truck. Because it was not clear who owned the truck, Arwood then

spoke with Verduzco in his patrol car and obtained Verduzco's consent to search at the 36:47 mark.

Arwood began to search the car at minute 38:05. Roughly an hour into the traffic stop, having found nothing more than what Kolbe had already noted, he had Howell retrieve his drug dog, Goose. Howell ran Goose around the outside of the truck, with no alerts. But when presented with a seam behind the rear seat of the interior of the truck, Goose alerted.[8] Arwood then explained to Anguiano that he had been performing a consensual search, but now (because Goose alerted) he had probable cause to perform a more extensive search. He had Defendants drive to a nearby mechanic, where the truck was more thoroughly searched, and the rear seats were removed. Fourteen kilograms of contraband were recovered—ten of cocaine and four of heroin—and Defendants were arrested.

## II.  DISCUSSION

The magistrate judge recommended denial of the four motions to suppress. Defendants filed a series of lengthy objections to various aspects of the Recommendation. Only one of these objections must be addressed at length, and its resolution compels adoption of the Recommendation.

In their initial briefs, Defendants argued that Arwood's knowledge of Kolbe's fruitless search undercut the Government's showing of reasonable suspicion to

---

[8] Kolbe's dog in Baldwin County only searched outside the truck.

justify the prolonged stop.   Only after the magistrate judge entered the Recommendation did Defendants pin this logic to a supporting line of cases.  *E.g.*, *United States v. Peters*, 10 F.3d 1517 (10th Cir. 1993).  The analysis begins with the black-letter law of *Terry v. Ohio*, then turns to *Terry*'s application in the context of so-called successive stops, and then finishes with the question of Arwood's reasonable suspicion to prolong the stop.

## A.   Routine Traffic Stops and *Terry v. Ohio*

The Fourth Amendment enshrines "[t]he right of the people" to be free from "unreasonable searches and seizures."  U.S. Const. amend. IV.  Routine traffic stops, like the two performed by Kolbe and Arwood, are "a limited form of seizure that is more analogous to an investigative detention than a custodial arrest," so they are examined under the rubric established by *Terry v. Ohio*, 392 U.S. 1 (1968).  *United States v. Holt*, 777 F.3d 1234, 1256 (11th Cir. 2015).  Thus, traffic stops must be limited in both scope and duration: the scope of the officer's actions "must be 'reasonably related . . . to the circumstances which justified the interference in the first place,'" *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (quoting *Terry*, 392 U.S. at 20), and "the duration of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop," *id.* (citing *United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999) (emphasis omitted).

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (internal citation omitted). This is not to say that police officers must single-mindedly pursue the traffic violation that resulted in the stop. *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."). "In particular, an officer may prolong a traffic stop to investigate the driver's license and the vehicle registration, including by requesting a computer check, or while waiting for the results of a criminal history check that is part of the officer's routine traffic investigation." *Holt*, 777 F.3d at 1256. Officers may also take other "negligibly burdensome precautions" that are necessary to safely complete the stop. *Rodriguez*, 135 S. Ct. at 1616. But "unrelated inquiries" that "measurably extend the duration of the stop" offend the Constitution. *Id.* "So too do safety precautions taken in order to facilitate such detours" from the stop's mission. *Id.*

The Fourth Amendment countenances these sorts of detours in only two situations. *United States v. Ramirez*, 476 F.3d 1231, 1237 (11th Cir. 2007) (citing *Pruitt*, 174 F.3d at 1220).

> First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring.    Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter.

*Pruitt*, 174 F.3d at 1220 (quoting *United States v. Hunnicutt*, 135 F.3d 1345 (10th Cir. 1998) (internal citations omitted).  The encounter becomes consensual if the officer receives valid consent to search, *see United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990), or if "a reasonable person would feel free to terminate the encounter" in view of the totality of the circumstances, *Ramirez*, 476 F.3d at 1240 (quoting *United States v. Drayton*, 536 U.S. 194, 201 (2002)).

## B.    <u>Successive Stops under *Terry*</u>

A discrete body of case law recognizes that, when the police stop the same person for the same thing on multiple occasions, the later stops are "inherently more intrusive and coercive than the first."  *E.g.*, *United States v. Ilazi,* 730 F.2d 1120, 1126 (8th Cir. 1984); *United States v. Morin*, 665 F.2d 765, 769 (5th Cir. 1982)*, abrogated in part on other grounds*, *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (*en banc*) ("The coercion inherent in the successive stop situation must be acknowledged.  Otherwise, an intrusion which can be much more severe than an actual arrest will be allowed to take place on the basis of much less justification.").  Thus arose the concept of the "successive stop," an apparent matter of first impression in the Eleventh Circuit.  Because Defendants' objections

emphasize the successive nature of Arwood's stop, this concept merits a quick explainer.

> A *Terry* stop prompted by reasonable suspicion can end in one of three ways:
>
> (1) the police gather enough information to develop probable cause and allow for continued detention, (2) the suspicions of the police are dispelled and they release the subject, or (3) the suspicions of the police are *not* dispelled, yet the officers have not developed probable cause but must release the suspect because the length of the stop is about to become unreasonable.

*United States v. Leo*, 792 F.3d 742, 751 (7th Cir. 2015) (internal citations omitted) (emphasis in original).  In other words, the investigating officer may either verify, dispel, or exhaust his suspicion.  If his suspicion is verified, the officer arrests the suspect or takes other enforcement action; if it is dispelled or exhausted, the Constitution demands the suspect's release.

Just as an officer may not detain a suspect after dispelling or exhausting his suspicion, he cannot release the suspect, turn around, and stop him again—at least not without "a new and independent basis for suspicion."  *Peters*, 10 F.3d at 1522.  As the Tenth Circuit has explained, "[t]he officer who performed the original investigation . . . may not release the suspect as required by *Terry* and *Place*,[9] wait until he has travelled down the road a few miles, and then make a second *Terry* stop based solely on the conduct that has already proved to be illusory."  *Id.* (footnote

---

[9] *United States v. Place*, 462 U.S. 696 (1983).

added).    Otherwise,  the  officer  could  "circumvent  [*Terry*'s]  requirements  by
subjecting  an  individual  to  successive  stops,  each  sufficiently  limited  in  scope  and
duration  to  satisfy  the  conditions  of  an  investigatory  seizure,  but  collectively  so
intrusive  as  to  be  tantamount  to  an  arrest."  *Ilazi*, 730 F.2d at 1125.  In that same
vein, just as an officer cannot repeatedly stop the same person for the same allegedly
suspicious conduct, he cannot "call[ ] upon a different officer to make the [later]
intrusion in his stead."  *Peters*, 10 F.3d at 1522.

Following  this  logic,  courts  across  the  country  have  applied  heightened
scrutiny to successive *Terry* stops.[10]  (For the remainder of this opinion, the term
*successive stop* refers to repeated *Terry* stops rooted at least partially in the same
already-dispelled  or  -exhausted  suspicion.)    Absent  guidance  from  the  Eleventh
Circuit, the court looks to the Second Circuit for a statement of the successive-stop
doctrine:

> [W]here the same suspicion justifies successive investigations, and the
> officer conducting the subsequent investigation is aware of the prior

---

[10] *E.g.*, *United States v. Padilla-Esparza*, 798 F.3d 993, 1000 (10th Cir. 2015); *United States v. Foreste*, 780 F.3d 518, 524 (2d Cir. 2015); *Peters*, 10 F.3d at 1522; *United States v. Garcia*, 23 F.3d 1331, 1335–36 (8th Cir. 1991); *Ilazi*, 730 F.2d at 1126; *Morin*, 665 F.2d at 769; *United States v. $167,070.00 in U.S. Currency*, 112 F. Supp. 3d 1108, 1122 (D. Nev. 2015); *cf. United States v. Green*, CR No. 3:13-16, 2016 WL 4386060, at *11 (W.D. Pa. Aug. 17, 2016) (upholding second stop where officer's reasonable suspicion was based on information independent from the first stop); *United States v. Hernandez-Mendoza*, No. CR 08-50027-KES, 2008 WL 3200748, at *3 (D.S.D. Aug. 5, 2008) (finding that arresting officer's independent reasonable suspicion to make the second stop distinguished the case from the successive-stop jurisprudence).  A small minority of courts have rejected the successive-stop doctrine out of fear that it will undermine law enforcement.  *See United States v. Whitehouse*, 922 F. Supp. 1, 6–7 (E.D. Mich. 1996); *Jha v. Commonwealth*, 444 S.E.2d 258, 260 (Va. Ct. App. 1994).

investigation and the suspicion that supported it, the investigations'
duration and scope must be both individually and collectively
reasonable under the Fourth Amendment.

*Foreste*, 780 F.3d at 524 (footnotes omitted).  This rule both follows logically from

Supreme Court precedent and avoids excessive restrictions on law enforcement.[11]

The successive-stop rule does not bar law enforcement from stopping the

same suspect twice.  Similarly, officers are not required to ignore the suspicious facts

that triggered the first *Terry* detention.  Rather, this rule asks police officers to take

into account both the initial causes for suspicion as well as the resulting search that

may have dispelled or exhausted that suspicion; it gives officers a fair swing at the

piñata while simultaneously protecting against harassing, repeated stops in violation

of a suspect's Fourth Amendment rights.

With these principles in mind, the analysis turns to the case at bar.

---

[11] Consider the example of an officer who identifies three causes for suspicion.  He dispels
the first, exhausts the second, but has to release the suspect before he can fully investigate the third.
Under *Foreste*, a second officer, informed of the original search of the suspect, could use the third,
unexhausted cause of suspicion as a partial basis for his own reasonable suspicion and *Terry* stop
of the suspect.
   By contrast, the Tenth Circuit has held that constitutionally permissible successive stops
must be supported by "a new and independent basis for suspicion."  *Peters*, 10 F.3d at 1522.  This
stricter formulation of the rule can require officers to close their eyes to the facts that gave rise to
the first stop.  Indeed, the Tenth Circuit seems to have walked back the *Peters* statement of the
rule.  *See Padilla-Esparza*, 798 F.3d at 1000 (reading *Peters* to allow successive stops based on
suspicions that were neither dispelled nor exhausted by the first stop).  Looking collectively to
both of the stops allows for a full investigation—within constitutional bounds—of all potential
causes of suspicion, not just the ones that the first officer had time or resources to investigate.

**C.**    **Arwood Did Not Prolong the Second Traffic Stop**

In their motions to suppress, Defendants claim that Arwood prolonged the Chambers County traffic stop in violation of the Fourth Amendment. Arwood pulled Defendants over after the Tundra crossed the fog line. To borrow *Rodriguez*'s framing, at that point Arwood's mission was "to address the traffic violation . . . and attend to related safety concerns." 135 S. Ct. at 1614. Arwood could deviate from his mission by taking "negligibly burdensome [safety] precautions," *id.* at 1616— such as running checks on the driver and the vehicle's registration, *Holt*, 777 F.3d at 1256. But he could not investigate other crimes on-scene, unless the encounter became consensual or he developed reasonable suspicion that such crimes had occurred or were occurring. *Ramirez*, 476 F.3d at 1237. Thus, the record will be examined to answer whether Arwood took a detour from his traffic-violation mission before Anguiano consented to the search. If he did not, then the stop was constitutional—the inquiry ends there. Only if he did take a detour does the analysis shift to whether he was constitutionally justified in doing so.

On review of the evidence, Arwood did not measurably prolong the stop by deviating from his traffic-violation mission. Defendants point to four pauses in the traffic stop during which Arwood investigated Kolbe's trafficking hunch rather than the moving violation that led him to pull Anguiano over. They claim that these pauses measurably prolonged the stop in violation of *Rodriguez*. But because the

16

delays resulted from Arwood's bona fide safety precautions and from conversations initiated by Anguiano, the stop stayed within the bounds set by *Rodriguez*.

In the first two pauses—from minutes 2:37 through 6:00, when Arwood fielded a phone call from Kolbe; and from minutes 7:34 through 9:43, when Arwood waited in his car for Howell to show up—Arwood had no on-the-scene backup. Although Arwood delayed his investigation while waiting, he later testified that Howell's presence was necessary to ensure that the stop could be completed safely. These first two pauses, therefore, are the sort of "negligibly burdensome precautions" tolerated by the Fourth Amendment. *Rodriguez*, 135 S. Ct. at 1616.

In the third pause, from minutes 10:18 through 14:51, Arwood and Howell sat in the car and drew up their plan of attack. At first, the officers discussed several topics relevant to the traffic violation: Defendants' claim that they switched drivers, the truck's mileage and purchase date, and Anguiano's lack of a license. Then the conversation shifted to the trafficking hunch. The officers discussed potential hiding places, such as the engine intake or the truck's tires; they discussed what Kolbe had shared from his prior search, including the places he searched, the drug dog's failure to alert, and Kolbe's suspicion that Defendants were carrying drugs; they discussed the single piece of luggage, which would be irrelevant to the question of a traffic violation; they discussed a separate sex-trafficking theory, apparently based on the Asiatic appearance of one of the truck's female occupants; and they discussed

running an open-air sniff on the car regardless of the results of a planned (consent-authorized) search.

To be sure, Arwood dedicated a large portion of this third pause to discussing the trafficking hunch; arguably, this delay may have been the sort of pretextual "safety precaution[ ] taken in order to facilitate . . . detours" from Arwood's mission. *Id.* But the court is convinced that Arwood did not cross the constitutional line. The stakes are higher for an officer investigating possible drug smuggling than for an officer investigating a mere traffic violation. The value of the contraband and the threat of arrest can lead suspects to act erratically, putting officers at risk. *Cf. Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (recognizing the "inordinate risk confronting an officer" during a traffic stop). Accordingly, Arwood had a valid safety justification for filling Howell in on the details of the trafficking theory, as the officer could better play his supporting role if he knew more about the context of the stop. Moreover, the Supreme Court has consistently given police officers leeway to take unobtrusive precautions, even if those precautions are unrelated to the initial cause for the traffic stop. *See, e.g.*, *Johnson*, 555 U.S. at 787–88 (holding that officer's questioning of a defendant, which "took place within minutes of the stop," and subsequent patdown, which "followed 'within mere moments' of [the suspect's] exit from the vehicle, did not "measurably extend the duration of the stop") (citation omitted). Therefore, Arwood's "unrelated inquiries [did] not

measurably extend the duration of the stop," making this third delay constitutionally permissible. *Rodriguez*, 135 S. Ct. at 1615 (alteration omitted).

Fourth, for minutes 23:16 through 28:54, Arwood continued to interview Anguiano after confirming his identifying information. At first blush, it is easy to see why Defendants flag this delay as impermissible: Arwood and Anguiano's conversation reels from topic to topic, ranging from Alabama' seafood and humid weather to Kolbe's prior stop of Defendants, until Arwood eventually asks for and receives consent to search the Tundra.

But Defendants miss a crucial point here. The in-car conversation did not ramble because Arwood sought to delay the stop illegally by investigating other crimes; it rambled because Anguiano, in apparent nervousness, continued to make small talk with Arwood throughout the interview. Anguiano brought up the basis of the prior stop, Anguiano brought up Kolbe's conduct during that stop—and it was Anguiano who brought up Alabama's fisheries, too. By contrast, during this span Arwood only initiated questioning regarding the truck's ownership (which was proper under *Holt*, 777 F.3d at 1256) and whether Kolbe had a drug dog perform a sniff test (which was a follow-up to an earlier comment by Anguiano). Arwood could have sped things along by ignoring Anguiano's questions, comments, and conversation; had he done so, maybe he would have asked for Anguiano's consent to search after twenty-six minutes rather than twenty-eight. But this is not what

*Rodriguez* requires. Rather, *Rodriguez* prohibits delays occasioned by "unrelated inquiries" or "[o]n-scene investigation into other crimes," not delays that result from humoring the suspect's attempts at conversation. 135 S. Ct. at 1615, 1616 (alteration omitted). This delay did not illegally prolong the stop.

Therefore, these four pauses do not constitute an impermissible stop-extending detour. And because the stop was not measurably prolonged, Arwood did not need reasonable suspicion to support Defendants' continued detention. Thus, because Arwood legally obtained Anguiano's consent to search the truck, the analysis does not reach the question whether the successive-stop rule would bar Arwood from developing reasonable suspicion on the basis of information already exhausted by Kolbe's prior stop.[12] Defendants' objection, therefore, was overruled.

Although Defendants raised additional objections to the Recommendation of the magistrate judge, these objections lacked merit and were overruled.

---

[12] Were successive-stop jurisprudence being considered, exhausted features of the first stop (dog sniff outside of the truck, search of the suitcase, suspicious features of the inside of the truck, nervousness of passengers, etc.) would be weighed against distinctive features of the second stop (different driver, different jurisdiction, different officer, different highway 210 miles from the first stop, different dog, different search inside the truck, different traffic investigation of a driver with no identification whatsoever, etc.). Moreover, the "purpose-of-the-trip" story told by one occupant in Baldwin County—a family reunion in Montgomery—was clearly a lie by the time of the second stop in Chambers County, with Montgomery seventy-seven miles in the rearview mirror. The magistrate judge correctly concluded that, in view of all the circumstances, the second stop was not an improper extension of the first.

## III.  CONCLUSION

Accordingly, on June 26, 2017, Defendants' objections (Docs. # 171, 172, 175, 181) were overruled, the Recommendation of the magistrate judge (Doc. # 162) was adopted, and Defendants' motions to suppress (Docs. # 86, 93, 96, 97) were denied.

DONE this 26th day of July, 2017.

_____
/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE